298 F.2d 772
 132 U.S.P.Q. 87
 COPEASE MANUFACTURING CO., Inc., a Delaware corporation,
Plaintiff-Appellant and Cross-Appellee,
v.
AMERICAN PHOTOCOPY EQUIPMENT CO., a partnership; Samuel G.
Rautbord, apartner; and American Photocopy
Equipment Company, an Illinois
corporation,Defendants-
Appellees and
Cross-Appellants.
COPEASE MANUFACTURING CO., Inc., Plaintiff-Appellant and
Cross-Appellee,
v.
PORAY, INC., an Illinois corporation, Defendant-Appellee and
Cross-Appellant.
 No. 13295-6.
 United States Court of Appeals Seventh Circuit.
 Dec. 26, 1961, Rehearing Denied Feb. 23, 1962.
 
 William C. Conner, Daniel L. Morris, Curtis, Morris & Safford, New York City; Edwin M. Luedeka, Soans, Anderson, Luedeka & Fitch; Charles M. Rush, Kirkland, Ellis, Hodson, Chafetz & Masters, all of Chicago, Ill. (Edward G. Curtis, Curtis, Morris & Safford, and Charles H. Tuttle, Breed, Abbott & Morgan, all of New York City on the briefs), for Copease Manufacturing Co., Inc.
 Albert E. Jenner, Jr., Richard Russell Wolfe, John J. Crown, Chicago, Ill. (Thompson, Raymond, Mayer, Jenner & Bloomstein, Jarrett Ross Clark, Franklin M. Crouch, Wolfe, Hubbard, Voit & Osanna, Chicago, Ill., of counsel), for defendants-appellees and cross-appellants.
 Before DUFFY, SCHNACKENBERG and SWYGERT, Circuit Judges.
 SCHNACKENBERG, Circuit Judge.
 
 
 1
 From the parts of a judgment of the district court invalidating a patent, entered in two causes[1] consolidated for trial, Copease Manufacturing Co., Inc., a Delaware corporation, plaintiff, appealed in No. 13295, and from other parts of said judgment, defendants, American Photocopy Equipment Co., a partnership, Samuel G. Rautbord, a partner, American Photocopy Equipment Company, an Illinois corporation,[2] and Poray, Inc., an Illinois corporation, filed a cross-appeal in No. 13296.
 
 
 2
 The patent in suit, U.S. Patent No. 2,657,618, was issued November 3, 1953 to Dr. Walter Eisbein, on an application filed April 17, 1950, and was assigned to plaintiff November 16, 1954. The patented machine is intended for use in connection with an improved method of photocopying known as the diffusion-transfer-reversal process, herein called the 'diffusion process'. Like the old 'wet process', the diffusion process involves exposure and developing steps. No claim to the development of the diffusion process is here involved. It was invented in 1939-1940 by either or both Dr. Edith Weyde of the German photographic firm I. G. Farbenindustrie Aktiengesellschaft, known as Agfa, and Dr. Andre Rott of the Belgian photographic firm Gevaert. Agfa filed a patent application on the process in Germany in 1941 and its first patent thereon was issued in Norway in 1943. Gevaert filed a patent application thereon in Great Britain in November 1939 and its first patent was issued in France on June 30, 1941.
 
 
 3
 The Eisbein patent states that it relates to 'improvements in a device for developing photographic or photomechanical reproductions,' and that the device is 'primarily suited for carrying out a photo-mechanical reproduction process such as is described in French Patent No. 879,995'. That process is Agfa's version of the diffusion process. It was publicly disclosed and demonstrated by Agfa at its plant in Leverkusen, West Germany in February, 1949. Eisbein did not hear of this process until that occasion.
 
 
 4
 From the findings of the district court[3] it appears that the device of the Eisbein patent, as well as that of the accused machines, respectively, is appratus designed for use in the development step of the diffusion process, which includes two steps: the exposure to light of the photosensitive emulsion on a 'negative' sheet, and the development of the negative with transfer of the image to a 'positive' sheet.[4]
 
 
 5
 Dr. Weyde's efforts, in her experimental work for Agfa in connection with the development-diffusion-transfer process, having proved unsatisfactory, Agfa made a machine designed to keep the positive and negative sheets under pressure throughout a substantial area at the same time. This machine included a large, rotatable drum and a group of endless belts which extended around a major portion of the periphery of the drum to squeeze the papers together over a large area as they passed between the drum and belts. The district court found that the machine was inappropriate for commercial production and general office use because of its large size, its large liquid capacity and frequent need for adjustment of the belts and rollers. Such adjustments were required because sheets sometimes tore, due to the lateral creepage of the belts along the supporting rollers.
 
 
 6
 According to Dr. Leubner, who was Dr. Weyde's superior, because of the commercial unsuitability of this machine and the belief that the process would never be profitable until an inexpensive, proficient and trouble-free machine, suitable for use by inexperienced office personnel, could be provided for performing the developing step, Agfa called a meeting of the members of the German Association of Manufacturers of Document Photocopying Equipment to be held at the Agfa plant in Leverkusen, Germany on February 23, 1949. This meeting was attended by fifteen or more persons, most of them manufacturers of photocopy equipment and representatives of this field.
 
 
 7
 At this meeting, Agfa scientists gave detailed information about the diffusion process and Dr. Weyde demonstrated the process, using the Agfa machine (in evidence as exhibit DX QQ). She also told the audience of her unsatisfactory experience in attempting to use rollers which press the positive and negative sheets together along a single line, and cautioned that, in order to avoid the formation of creases and wrinkles and insure good copies, the two sheets must be held together under pressure throughout a substantial area.
 
 
 8
 Four manufacturers agreed to undertake the design of a suitable developing machine. Trikop, later called Develop, represented by Dr. Eisbein, was a small newcomer in the industry, while the others were leading German manufacturers of photocopy equipment.
 
 The district court found:
 
 9
 'Following the demonstration, the companies represented were invited to undertake the design and conception of a suitable commercial machine for performing the developing-transfer step of the diffusion-transfer-reversal process. Representatives of four manufacturers, including Dr. Eisbein, agreed to attempt to accomplish that object. May 1, 1949 was set as the deadline for the four companies to submit to AGFA their respective machine designs.'
 
 
 10
 Approximately a week after the meeting at Leverkusen, Agfa wrote to each of the four companies which had agreed to undertake the design of a machine. This letter contained detailed information about the diffusion process and was accompanied by a blueprint of the Agfa machine. The third paragraph of the letter repeated the precaution which Dr. Weyde had expressed at the meeting.
 
 
 11
 On the train going home from the meeting in Leverkusen, Dr. Eisbein made the first tentative sketches of his machine design. Before the end of March, 1949, he had constructed a first model of the machine, within a few months had perfected its operation, and by the middle of June had successfully demonstrated an improved model of the machine to Agfa in Leverkusen. The Agfa executives found the Eisbein machine 'absolutely excellent,' although first they were 'surprised' to find that Eisbein had disregarded the express warning which Agfa had given him concerning the necessity of pressing the sheets together over an area simultaneously and had used rollers which press the sheets together along substantially a single line. However, their exhaustive tests proved that the machine was 'fool-proof'.
 
 
 12
 Following this successful demonstration, Agfa called another special meeting of the Association of the Manufacturers of Photocopy Equipment to be held at Rudesheim, Germany on June 29, 1949. On that occasion, Dr. Eisbein demonstrated his machine to the entire Association. The enthusiasm with which this machine was received by the members of the Association is shown by the fact that, even though all of them were competitors of Dr. Eisbein's company, Trikop, in the manufacture of photocopying equipment, they gave Dr. Eisbein orders for 'nearly a hundred' of his machines following the demonstration. Orders were received even from the other three companies who had themselves undertaken to design machines.
 
 The district court found:
 
 13
 'None of the other three companies which had undertaken to design a machine ever submitted a machine design to AGFA.'Mr. Strattman of Fotokopist, who was called as a witness by defendants, admitted on cross-examination that his company had actually attempted to design a workable machine but had been unable to do so.
 
 
 14
 The Eisbein machine was first announced to the general public in October, 1949, and enjoyed immediate public acceptance.
 
 
 15
 The basic or independent claims of Eisbein U.S. patent 2,657,618 relate to a mechanical device having three primary parts: (1) a liquid-tight casing; (2) guides for guiding two or more sheets of emulsified photocopy paper into and through developer liquid in that casing; and (3) a pair of wringer-rollers located within that casing for squeezing the sheets of photocopy paper together after they have been moistened in their passage through the liquid.
 
 
 16
 In the diffusion process the coated side of a photosensitive, exposed negative sheet and the chemically coated side of a positive sheet of transfer paper are moistened with developing and solvent liquid, placed face to face and then pressed together. After the two sheets have passed through the wringer-rollers and are pressed together they stick one to the other. When pulled apart, some 10 to 40 seconds later, the negative sheet has a developed negative image and a positive image has formed on the positive transfer sheet by chemical action.
 
 
 17
 When the device of the Eisbein patent is used with this process the negative and positive sheets are pushed along rigid, perforated, plastic, superposed guide plates which dip down into developing liquid contained in the bottom of a liquidtight casing and extend through the liquid up to the bite of wringer-rollers which engage and press the sheets together, draw them from the liquid bath and eject them from the casing.
 
 
 18
 The district court's findings reveal that from May 1953 to the end of 1959, plaintiff sold in the United States 7200 of the patented machines made by Eisbein's company, for a sales volume of about $2,000,000, that the patent in suit has been generally respected, six United States companies having taken licenses thereunder; that prior to 1952, defendant APECO was engaged principally in the manufacture and sale of equipment and supplies for making photocopies according to the old 'wet process', and APECO first learned of the diffusion process from an Eisbein machine advertisement in a Swiss newspaper, whereupon it immediately corresponded with the advertiser, and that defendant Samuel G. Rautbord invited one Carstens, an export agent for Dr. Boeger K.G. of Hamburg, Germany, a licensee of Eisbein, to bring a small hand-operated developing machine known as the 'Copyfix' to Chicago, were it was demonstrated for Rautbord and other APECO personnel in May 1950. Rautbord expressed a strong interest in obtaining exclusive sales rights to the machine for the United States. While Carstens was in Chicago Rautbord ordered through Boeger one of the Develop machines made by Eisbein's company in Germany, which machine was received by APECO around the first part of June 1950. Rautbord questioned Carstens about the U.S. patent situation. The court's finding 59 reads:
 
 
 19
 'Defendant Rautbord negotiated to obtain for APECO exclusive rights in the United States both as to the machines and as to the paper. During the course of these negotiations, defendant Rautbord was notified about the filing of the application for the U.S. patent in suit and of its serial number and filing date'.
 
 
 20
 In May or June 1950, Rautbord employed Manfred J. Pollak, consulting engineer, to design for APECO a developing machine for the diffusion process, giving him for guidance all data he had obtained in connection with the German machines, and the machines themselves. See finding 60.
 
 
 21
 The district court held, in conclusion of law No. 3, that the claims of the patent sued upon fail to define patentable invention and are invalid, and, in conclusion No. 5, that it is a combination patent, consisting of old elements, no one of which standing alone is patentable. In conclusion No. 6 the court held that the structure defined is no more than an aggregation of separate elements and produces no new, unobvious result.
 
 
 22
 1. As in every patent case, there is here a presumption that the patent in suit is valid. The burden of establishing invalidity rests on defendants. 35 U.S.C.A. 282. Helms Products v. Lake Shore Mfg. Co., 7 Cir., 227 F.2d 677, 680.
 
 
 23
 This presumption is not an idle gesture, Artmoore Company v. Dayless Mfg. Company, 7 Cir., 208 F.2d 1, 3, cert. denied 347 U.S. 920, 74 S.Ct. 518, 98 L.Ed. 1075, and is not to be overthrown except by clear and cogent evidence. Helms Products v. Lake Shore Mfg. Co., supra, in which we said, at 680 of 227 F.2d:
 
 
 24
 'The defendant here insists that by reason of the manner in which this patent was presented to the Patent Office, the attention of that office was directed away from pertinent prior art patents and, therefore, there is no presumption that such prior patents were considered by the Patent Office and were found not to constitute prior art to the patent in suit. It is true that the three patents on which the defendant principally relies were not cited by the Patent Office, but as this court said in Artmoore Company v. Dayless Mfg. Company, 7 Cir., 208 F.2d 1, 4, '* * * it is as reasonable to conclude that a prior art patent not cited was considered and cast aside because not pertinent, as to conclude that it was inadvertently overlooked. * * *"
 
 
 25
 Unlike the situations in Helms and the case at bar, is Day-Brite Lighting, Inc., v. Sandee Manufacturing Co., 7 Cir., 286 F.2d 596, relied on by defendants. Day-Brite's unique facts foreclosed any reasonable conclusion that the prior art 'Twinlite' panel with its 'spaced transverse ribs' was considered and cast aside by the patent office because not pertinent. It would have been irrational to contend that the use of the 'spaced transverse ribs' in the 'Twinlite' panel was not pertinent when considering the use of precisely the same 'spaced transverse ribs' on the patent in suit. The facts in Day-Brite conclusively established pertinency. For that reason, we find our holding in Day-Brite has no bearing here.
 
 
 26
 2. The district court relied upon certain prior art and publications to invalidate the Eisbein patent. They are before us and we have examined them.
 
 
 27
 a. In the Agfa machine the positive and negative sheets were inserted through separate inlet openings, and moved straight downwardly to the liquid and into it for a very short distance before being pressed together between the drum and belt. The sheets were held together under pressure between the drum and belt during the entire remainder of their rather lengthy passage through and out of the liquid. At the point where the drum and belt separated, the adhering sheets were stripped from the drum by fingers which also served as guides to conduct the papers out of the machine through a fourth slot in the lid.
 
 
 28
 We have examined the Agfa machine and the drawings thereof and find it obvious that it is dissimilar to the Eisbein machine.
 
 
 29
 Eisbein in claim 1 calls for an arrangement of contacting rollers or, in claim 5, a set of rollers comprising at least one pair of contacting rollers, while Agfa has neither.
 
 
 30
 Eisbein in claims 1 and 5 calls for a type of guiding means. Such a type is not called for in Agfa. While short wires are attached to the removable cover of the Agfa machine, they do not 'guide a plurality of strips in paths * * * extending below the level of the liquid in the casing', as required by claim 1 of Eisbein, nor are they 'constructed and arranged to allow access of liquid to at least one of' the strips therein as further recited in Claim 1 of Eisbein. Moreover, the Agfa machine does not have wires formed to convey the sheets through the liquid and then to the set of rollers as called for in Eisbein claim 5.
 
 
 31
 Eisbein's claim 4 calls for 'a member removable from the casing, * * *' with 'gearing for driving the rollers, * * * rollers and guide channels being mounted on said member,'-- which lacking in the Agfa machine; nor did Agfa have rollers so arranged that 'the contacting portions of said rollers are at a level normally above the surface of the liquid,' as called for in claim 11 of Eisbein.
 
 
 32
 In addition to what has been said about the Agfa machine, which never reached beyond the laboratory, because it was unfit for commercial use, it is apparent from the record that it performed a different sequence of operations from that performed by the Eisbein machine.
 
 
 33
 b. Next the district court relied on patent No. 858,023 to Post, an apparatus for making copies of inked manuscripts by the ancient 'letter press' method, in which an inked manuscript to be copied is pressed against a moistened strip of absorbent, translucent copy paper which dissolves from the manuscript a sufficient quantity of ink to form a legible copy of the writing. Although this copy is a reversed or 'mirror' image due to the face to face relationship of the two sheets, the translucence of the copy of sheet permits it to be held up to the light and read from the back side, thereby reversing the image and making it readable. This patent has nothing whatever to do with photocopying. It does not disclose fixed guide elements for guidings sheets into and through a liquid, nor even a casing for holding liquid. Thus, of the three mechanical elements recited in the patent claims, Post shows only one: a pair of contacting rollers. While Post also shows an arrangement of a belt and rollers, as in Agfa, which the district court held to be equivalents, it is apparent that Post does not disclose the pressing together of 'moistened sheets', as the district court's finding 71 states, since only one of the two sheets is moistened. In addition, the sheets do not adhere to one another as they do in the diffusion process, so that Post was not confronted with the problem of wrinkling and creasing of two moistened, adhering sheets due to their differing degrees of expansion when wet, which was one of the principal problems which confronted Dr. Eisbein in connection with the diffusion process. Thus, the Post patent did not teach the suitability of rollers for use in the diffusion process.
 
 
 34
 c. U.S. Patent 2,435,717 to E. H. Land (Polaroid-Land camera), is a combination of elements entirely different from that claimed in the patent in suit. The camera has no casing for holding developer liquid at a given level, as called for in each of the Eisbein patent claims. Nor does it have any fixed guide means for conveying sheets into, through and out of a liquid, as recited by the claims. Nor does it have a center separator for keeping the two sheets separate until they have entered the liquid, as the claims require. In fact, the only thing which the structure shown in this patent has in common with the claimed structure is a pair of rollers.
 
 
 35
 d. In finding 72 the district court referred to Land patent 2,500,421, which, however, we find relates to the process and not to any apparatus.
 
 
 36
 e. U.S. patent 717,021 to Pollak shows a machine for developing a single sheet of conventional photographic film or paper. The single sheet or strip of photographic film or paper passes first between one pair of rollers, then into the developing tank, then between the second pair of rollers, then into the fixing tank, and finally between the third pair of rollers. This patent has nothing whatever to do with any process in which two sheets of material are pressed together. Thus, there is no disclosure of the feeding of two sheets simultaneously and in superposed relation through a liquid, as specifically recited in each of the Eisbein patent claims. Nor is there any means for separating such sheets until they have been made wet by the liquid, as called for in each of the claims.
 
 
 37
 However, the district court's finding 74 erroneously referred to this patent as describing rollers 'whose point of tangency is above the level of the liquid for squeezing the sheets emerging from the liquid, for effecting image transfer from one sheet to the other'. As pointed out, Pollak patent 717,021 had nothing to do with an operation involving more than one sheet. The confusion of the district court in this respect is asscribable to the effort of defendants to accomplish a courtroom amendment of the Pollak patent by demonstrating at the trial, by means of a scale model, that the diffusion process can be performed by the Pollak device either with 'manual separation or by the addition of a separator'. The court excluded any part of the demonstration and any of the exhibits resulting therefrom, but admitted in evidence the construction itself as shown by testimony offered by defendants.
 
 
 38
 In Young Radiator Co. v. Modine Mfg. Co., 7 Cir., 55 F.2d 545, 547, we applied the following language, which is traceable to Topliff v. Topliff, 145 U.S. 156, 161, 12 S.Ct. 825, 828, 36 L.Ed. 658:
 
 
 39
 '* * * It is not sufficient to constitute an anticipation that the device relied upon might, by modification, be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted, nor actually used, for the performance of such functions.'
 
 
 40
 The same principle we had in mind when, in National Slug Rejectors, Inc. v. A.B.T. Mfg. Corporation, 7 Cir., 164 F.2d 333, we said, at 337:
 
 
 41
 'In the first place, it is rather hard on a patent running the test of patentable novelty, to take the most favorable construction of the drawings in another patent, and for which the inventor never intended them to be used, with drawings of another patent never put in use, and tie them up with the drawings of still another patent, not used as a lower weighted spurious coin ejector and out of all three designs create a mechanism which could be used to eliminate an under-weighted coin.'
 
 
 42
 While defendants are entitled to credit for ingenuity in their attempt to enlarge the scope of Pollak as prior art, we think that their effort is no more productive than the expression of the layal fan who says that, if a home run had been made by the home team in the ninth inning, the baseball game would have been won.
 
 
 43
 f. The district court in finding 77 found the structure before us disclosed and anticipated by a machine described in U.S. patent 381,226 issued to Edwards in 1888, which relates to a machine for galvanizing or tinplating steel sheets.
 
 
 44
 This patent has nothing to do with photocopying, of course, or even with the handling of paper or any other type of sheet material which expands when wet; nor has it anything to do with the feeding of two sheets simultaneously between a pair of rollers or other pressure means. These facts, and others readily suggested, point definitely to the conclusion that the arrangement involved in that patent, which pertained to the handling of semirigid material, would be unsatisfactory for the feeding of limp sheets of wet paper through rollers.
 
 
 45
 g. The district court, in finding 72, also found that the use of wringer-rollers in connection with the diffusion photocopying process was commonly accepted as disclosed by prior publications, and referred particularly to the PSA Journal of January, 1947. Is so doing the court clearly erred. The record herein shows that the reference therein to an arrangement of a suitable system of rollers means the Agfa machien which was described in Norwegian patent 66,994, which was existent at the time of the conference at Leverkusen. We have pointed out that Eisbein undertook to and did solve the problem then existing because of the unsuccessful Agfa arrangement. That article taught nothing which entered into the patent in suit.
 
 
 46
 h. The district court also clearly erred when it found, in finding 72, that, in the field of photograph generally, wringerrollers for pressing together and squeezing two or more wet sheets of photographic material to effect image transfer grom one to another had been a common expedient, as shown by The Complete Photographer, Vol. 3 (1942), at page 931, and Photographing in Color (1940), at page 127.
 
 
 47
 These publications, which we have examined, disclose the use of rollers in the carbro color photographis process. Aside from the difference of this process from that served by the patent in suit, both in objective and in procedure, the publications fail to disclose a casing or guides of the type recited in the patent claims. They are limited to showing that rollers have been used before for other purposes in the photographic field.
 
 
 48
 In summary, we find no anticipation of the Eisbein machine in the prior art. We find clearly erroneous that part of finding 78 which is in these words: 'It is anticipated by the prior art.'
 
 
 49
 In its entirety, finding 78 reads as follows:
 
 
 50
 'The machine of the Eisbein patent in suit would have been obvious to one skilled in the art at the time it was first made by the patentee. Every element of the Eisbein machine was old and functions in that machine in its usual manner. No new coaction between the elements takes place nor is any unobvious result achieved. It is anticipated by the prior art. It does not meet the standard of invention required by the Patent Statute.'
 
 
 51
 3. However, defendants now contend that, the court, having found that the prior art anticipated the Eisbein device, and, based thereon having concluded that the Eisbein apparatus was unpatentable over the prior art, 'under these circumstances * * * the Trial Court's findings must be accorded 'great weight". They then rely on F.R.Civ.P. rule 52(a), 28 U.S.C.A., to support their statement that these findings and conclusions are thoroughly supported by the record and should be affirmed.
 
 
 52
 As we have already indicated, we are holding the district court's finding as to anticipation by the prior art, clearly erroneous.
 
 
 53
 The mention of 'conclusions' by defendants, in referring to rule 52(a), is a recognition that finding 78 is really a statement of conclusions of law, with the exception of the finding of fact which we have found to be clearly erroneous. However, defendants assert that plaintiff, unable to establish a factual setting at trial to support patentability, now seeks to have this court retry the factual issues de novo under a guise of review of an issue of law.
 
 
 54
 Plaintiff relies on our holding in Armour & Co. v. Wilson & Co., 7 Co., 274 F.2d 143, and the provision of 35 U.S.C.A. 103, which reads in part:
 
 
 55
 'A patent may not be obtained though the invention is not indentically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented, and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. * * *'
 
 
 56
 In the Armour case this statutory language was said, at 156, to require
 
 
 57
 '* * * the application of the correct legal criteria to the factual determination made by the trial court. This calls for the exercise of a legal judgment and as such is subject to review by an appellate tribunal as a question of law.'
 
 
 58
 This function of a court of appeals finds recent application by senior Circuit Judge Learned Hand, who wrote an opinion in Reiner v. I. Leon Co., 285 F.2d 501, at 503-504 (1960), which involved the validity of a patent for a device to maintain curls in a woman's hair. Judge Hand said:
 
 
 59
 '* * * It is idle to say that combinations of old elements cannot be inventions; substantially every invention is for such a 'combination': that is to say, it consists of former elements in a new assemblage. All the constituents may be old, if their new concurse would not 'have been obvious at the time the invention was made to a person having ordinary skill in the art' (103, Title 35). That has been the statutory definition since January 1, 1953. * * *
 
 
 60
 'The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, 'obvious' is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it. There are indeed some sign posts: e.g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who use the new variant? * * * In the case at bar the saving of material as compared to anything that had preceded, was very great indeed; the existing devices at once yielded to Reiner's disclosure; his was an answer to the 'long-felt want."
 
 
 61
 The issue of law presented is one which we obviously are in as good a position to determine as was the district court. The latter's conclusion on this issue, not being on a question of fact, is not clothed with a presumption of correctness, and instead requires that we make our own independent determination thereon.
 
 
 62
 Rule 52(a) does not require us either to accept findings unsupported by the evidenced or clearly erroneous, nor require us to respect conclusions which do not rest properly on the facts of the case. Campana Corp. v. Harrison, 7 Cir., 114 F.2d 400, 405.
 
 
 63
 In the case at bar there is significant support of the view that the Eisbein invention was not obvious, in the fact that defendants purchased and copied the machines of the patentee and one of his licensees. In fact, they turned them over to a consulting engineer for the purpose of designing a machine for them. They could have probably achieved immunity from any claim of infringement of the patent in suit by copying any of the prior art on which they relied in this action. The words of the Supreme Court in Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, at 441, 31 S.Ct. 444, 450, 55 L.Ed. 527, are in point:
 
 
 64
 '* * * The prior art was open to the rubber company. That 'art was crowded,' it says, 'with numerous prototypes and predecessors' of the Grant tire, and they, it is insisted, possessed all of the qualities which the dreams of experts attributed to the Grant tire. And yet the rubber company uses the Grant tire. It gives the tribute of its praise to the prior art; it gives the Grant tire the tribute of its imitation, as other have done. * * *'
 
 
 65
 We were impressed with the same thought when we said in Ric-Wil Co. v. E. B. Kaiser Co., 7 Cir., 179 F.2d 401, 404:
 
 
 66
 '* * * The prior art upon which defendant now lavishes its praise was apparently permitted to lie dormant until the exigency, created by a suit for infringement, required its resurrection. Defendant's imitation of the patent structure is another indication of invention. * * *'
 
 
 67
 A novel combination of old elements which so cooperate as to produce a new and useful result or a substantial increase in efficiency is patentable. Lewyt Corporation v. Health-Mor, Inc., 7 Cir., 181 F.2d 885, 857, 858; Helms Products v. Lake Shore Mfg. Co., supra, 227 F.2d 681; Weller Mfg. Co. v. Wen Products, Inc., 7 Cir., 231 F.2d 795, 798; Mojonnier Dawson Co. v. United States Dairies Sales Corp. 7 Cir., 251 F.2d 345.
 
 
 68
 The new and useful result reached by Eisbein was the first practical office photocopying system. By means of his machine, which was compact, lightweight, uncomplicated, inexpensive, capable of operation and maintenance even by inexperienced office personnel, and yet which produced copies of excellent quality and photographic accuracy in only a few seconds' time, he took the diffusion process out of the laboratory and made it available on a practical basis for use in offices. He did this where others failed.
 
 
 69
 We find and hold that the invention embodied in Eisbein's patent in suit is a new combination of old elements which produced a new and improved result and that the invention was not obvious to one having ordinary skill in the art.
 
 
 70
 4. One ground for defendants' cross-appeal was raised at the close of plaintiff's case and again at the close of all the evidence, when defendants American Photocopy Equipment Co., a partnership, and Samuel G. Rautbord, a partner, moved to dismiss plaintiff's action as to them because the partnership ceased business operations and conveyed its assets to the corporate defendant in January 1954. Defendants argue that plaintiff acquired no rights against them antedating November 16, 1954.
 
 
 71
 The patent in suit was granted on November 3, 1953, on application 156,290 filed April 17, 1950. On October 1, 1951, Eisbein assigned his claims on issuance of this patent of Messrs. Develop Kommanditgesellschaft Dr. Eisbein & Co., herein called 'Develop'.
 
 
 72
 On November 16, 1954, plaintiff was organized under the laws of Delaware. On the same day, Dr. Eisbein executed and delivered to plaintiff an assignment of 'the entire right, title and interest * * *' in said letters patent 2,657,618. This action was authorized by Develop. The assignment of November 16, 1954 expressly affects the entire right, title and interest in the patent in question. It contains no language respecting any prior acts of infringement of said patent or of any conveyance of a right to recover or sue for any such prior acts.
 
 
 73
 Accordingly, we hold that, by virtue of that assignment, Copease acquired no right to sue for infringements which took place prior to November 16, 1954. Moore v. Marsh, 7 Wall. 515, 74 U.S. 515, 522, 19 L.Ed. 37. Moore was followed in Crown Die & Tool Co. v. Nye Tool Works, 261 U.S. 24, 41, 43 S.Ct. 254, 67 L.Ed. 516, which reversed this court.
 
 
 74
 It follows that the district court erred in denial of the aforesaid motions of the partnership and Rautbord.
 
 
 75
 5. The district court found, and so concluded, that, since the issuance of the patent in suit, defendants had made and sold five types of machines, each of which infringed claims 1 through 5 and 11 of the patent in suit, by satisfying the limitations of these claims.
 
 
 76
 Defendants contend that they have not infringed any of the Eisbein patent claims and that, in finding and concluding otherwise, the district court erred as a matter of law.
 
 
 77
 All of these machines which were before the district court have been produced before us and examined. They have been considered in connection with the conflicting contentions of the parties.
 
 
 78
 Lloyd E. Varden, an expert witness produced by defendants, under cross-examination, admitted that in the use of defendants' machines, essentially the same process was performed as that performed in the machine disclosed in the Eisbein patent.
 
 
 79
 The district court, in finding 68, found that defendants' machines and the Eisbein machine perform substantially the same function in substantially the same way to produce substantially the same result, and are full equivalents.[5]
 
 
 80
 From our examination of the accused machines as well as Eisbein's machine, and a consideration of the other evidence in the record, we cannot disturb the findings of the court on infringement by defendants. There is evidence to support the findings and they are not clearly erroneous, under rule 52(a).
 
 
 81
 While the applicability of the doctrine of equivalents is a question of law, we do not rely on that doctrine and threefore find it unnecessary to decide whether defendants are right in contending that that doctrine cannot be applied in this case.
 
 6. Finding 70 of the district court reads:
 
 82
 'Defendants' infringement of the patent in suit was and is wilful and wanton.'
 
 
 83
 Furthermore, in finding 69, the court found:
 
 
 84
 'APECO was advised by its own attorneys that at least some of the claims of the patent in suit were readable upon the APECO machines.'
 
 
 85
 In this court defendants surprise us by alluding to certain testimony and stating:
 
 
 86
 'The above represents the entire record to which plaintiff can point to support the Trial Court's finding that Apeco acted 'wilfully and wantonly with knowledge that its devices were infringements'. * * *'
 
 
 87
 They are referring to plaintiff's vicepresident Gale's testimony that Rautbord read to him and Hallenborg[6] in plaintiff's office, in 1955, from a letter he had received from his patent attorney, which expressed the latter's opinion that the Eisbein patent was probably infringed by Apeco's machines, although the attorney was of the opinion that the patent would not be held valid.
 
 
 88
 We cannot take seriously the suggestion that the district court based its finding of wilfulness and wantonness on only this evidence. As hereinbefore indicated, ante 6, 7, the district court relied on other evidence, from which it made other findings, and drew conclusions, establishing in effect that defendants copied machines made by Eisbein and one of his licensees; that they were notified, through Rautbord, of the filing of the application for the U.S. patent in suit, its serial number and filing date, before they manufactured the accused machines; and that, while secretly planning to infringe it, they pretended to negotiate in good faith for exclusive rights under the patent in suit. In addition, in 1956 APECO circulated promotional sales material advertising one of the infringing machines, describing it as 'a Revolutionary New Invention for fast, low cost Office Copying.'
 
 
 89
 7. In this court, defendants assert that plaintiff did not charge them with wilful infringement in their amended and supplemental complaints. However, there was a prayer that 'damages be increased to three times the amount found or assessed.' The practical effect of this language was to notify defendants that reliance was placed by plaintiff upon 35 U.S.C.A. 284 and that plaintiff intended to offer in support of its complaint evidence that defendants wilfully and wantonly infringed.
 
 
 90
 8. Defendants contend that whether or not an infringement, even if found, was wilful and wanton should not have been determined by the district court until after an accounting had been had. They city Pyle Nat. Co., v. Lewin, 7 Cir., 92 F.2d 628, 631; Collins v. Kraft, 144 F.Supp. 162, D.C.Md.; E-I-M Company v. Philadelphia Gear Works, Inc. 5 Cir., 223 F.2d 36; Miner T. H. Symington Co., 2 Cir., 247 F. 515.
 
 
 91
 We have examined all of these cases and nevertheless are of the opinion that they do not justify our disapproving the procedure followed by the district court in this case. Moreover, defendants' contention is rendered less persuasive by the fact that it was not asserted in the district court. Certain fundamental principles control the situations. A determination as to wilfulness enters into the fixing of liability upon which a claim for treble damages for infringement is based. A proceeding for accounting is one of the methods provided by law for the subsequent enforcing of the provisions of such a judgment.
 
 
 92
 We are conviced that the evidence in the record was sufficient to sustain the court's finding 70 as to wilful and wanton conduct, followed by conclusions 7 and 9.[7] The matters encompassed thereby were properly settled before the taking of an accounting.
 
 
 93
 9. It does not appear that any ruling was made by or asked of the district court in regard to the allowance of attorneys' fees for plaintiff, which is understandable in view of that court's disposition of the case. It is now apparent, in view of our disposition of this appeal, that defendants are not entitled to an order for the allowance of their attorneys' fees. 35 U.S.C.A. 285.
 
 CONCLUSION
 
 94
 For the reasons which we have stated, in No. 13295, the judgment (paragraphs 3 and 5) of the district court against plaintiff on the issue of validity is reversed and, in No. 13296, the said judgment (paragraph 2) as to the issue of the right of plaintiff to sue for all acts of infringement committed after the issuance of the patent in suit is reversed as to acts occurring before November 16, 1954, and said judgment in all other respects is affirmed, and this cause is hereby remanded to the district court for further proceedings not inconsistent with the views herein expressed. Ninety percent of the costs in this court will be taxed against defendants and ten percent thereof against plaintiff.
 
 
 95
 In part, affirmed, and in part, reversed and remanded with directions.
 
 
 
 [1]
 Nos. 55 C 550 and 55 C 2179
 
 
 [2]
 This corporation and the partnership are sometimes referred to herein singly and together as APECO
 
 
 [3]
 Copease Mfg. Co. v. Am. Photocopy Eq. Co. et al., D.C., 189 F.Supp. 535, 537-538
 
 
 [4]
 In the usual method of effecting the first step, the original sheet to be copied is placed in face-to-face contact with the photosensitive negative sheet coated on one side with an emulsion layer containing a dispersion of silver halide grains, with the 'copy' side of the original in contact with the emulsion side of the negative. Light is directed through the back of the negative sheet against the 'copy' side of the original. The light reflected from the original back onto the negative exposes the latter to form in its emulsion a latent image consisting of a pattern of exposed silver halide grains. This latent image or pattern of exposed silver halide grains is a reversed or 'mirror' image of the original, due to the face-to-face relation of the two sheets during the time of the exposure to light
 After this exposure operation, the original and negative are separated, the original having no further function in the process. The second step requires that the negative sheet be moistened with a processing liquid and pressed face-to-face against the positive sheet, which may also be moistened. The latter is coated on its face with a nonphotosensitive emulsion which contains specks of metallic silver or the like to serve as precipitation nuclei (in effect, catalysts) to induce reduction of unexposed silver halide grains on the negative sheet. The negative and positive sheets, when pressed together after moistening, tend to adhere one to the other. The sheets are left in contact for approximately ten to forty seconds. When peeled apart, a positive image formed by chemical action appears on the positive sheet. They quality of the positive image depends, among other things, on the quality and contents of the processing liquid, that of the chemical emulsions on the sheets, the exposure time, and the time during which the sheets remain in contact. A waiting period is necessary in order to develop a visible or patent transfer image on the positive sheet.
 The processing liquid contained within the developing machines contains both a developing agent and a silver halide solvent. When the negative sheet or both negative and positive sheets are immersed in the processing liquid, the developing agent reduces the silver halide grains in the exposed areas of the emulsion (corresponding to the light background areas of the original) while leaving the unexposed portions of the negative (corresponding to the dark printed matter of the original) unaffected. When the moistened sheets are pressed together in face-to-face relations, the silver halide solvent in the processing solution dissolves the unexposed grains of silver halide and causes them to be diffused from the emulsion of the negative into that of the positive, where the developer acts with the assistance of the 'catalyst' to reduce these unexposed grains to metallic silver, producing blackened areas corresponding to the dark areas of the original and produce a positive copy of the original. The second 'mirror' reversal produced by this face-to-face transfer operation makes this a 'rectified' or readable copy.
 
 
 [5]
 In Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097, the court said:
 'A finding of equivalence is a determination of fact. * * *'
 
 
 [6]
 Charles E. Hallenborg, plaintiff's President
 
 
 [7]
 In conclusion 9 the court denied defendants' claim for costs of suit and attorneys' fees pursuant to 35 U.S.C.A. 285, having determined that defendants acted wilfully and wantonly, with total disregard and in definance of prevailing moral and ethical business standards; that defendants deliberately copied and imitated plaintiff's construction
 In conclusion 7 the court determined that defendants infringed claims 1 through 5 and 11 of the patent in suit.