**ARNEL INDUSTRIES, INC., Plaintiff,**

v.

**AEROSOL RESEARCH COMPANY (VALVE CORPORATION OF AMERICA), substituted defendant, Defendant.**

**Civ. A. No. 65 C 181.**

United States District Court, N. D. Illinois, E. D.

Oct. 23, 1969.

Myron C. Cass and I. Irving Silverman, of Silverman & Cass, Chicago, Ill., for plaintiff.

Marshall W. Sutker, of Dressler, Goldsmith, Clement, Gordon & Ladd, Chicago, Ill., for defendant.

## FINDINGS OF FACT

LYNCH, District Judge.

1. This action charging defendant with infringement of U.S. Patent No. 3,162,329 (hereinafter referred to as the "Gregory patent") was filed on February 5, 1965.

2. The Court has jurisdiction of this matter pursuant to Title 28, (1952) U.S. C., Section 1338.

The Gregory patent was issued on December 22, 1964 to Joseph J. Gregory. Said patent was granted upon a continuation-in-part application filed on January 11, 1962 (the parent application, U. S. Application Serial No. 72,959, was filed on December 1, 1960).

4. Plaintiff, Arnel Industries, Inc., is an Illinois corporation and a resident of this judicial district. Plaintiff is, and has been for all times relevant to this suit, the owner of the Gregory patent.

5. During the pendency of this action, the named defendant, Aerosol Research Company, was merged into the Valve Corporation of America, a Delaware corporation, which then became the substituted defendant herein. Because this suit concerns the activities of Aerosol Research Company prior to the merger, the term "defendant" refers to the Aerosol Research Company.

6. In its Answer to the Complaint, defendant denied infringement and asserted invalidity of the patent upon numerous specified grounds including the averment, contained in Paragraph 7 thereof, that the patent in suit was invalid because the invention thereof had been in public use or on sale in the United States more than one year prior to the filing date of the application on which said patent issued. Title 35, U.S. C., Section 102(b) defines the above activity as an affirmative defense to a charge of patent infringement.

7. Pursuant to a pretrial conference held on September 11, 1967 and with the agreement of the parties hereto, the Court ordered a separate trial of the statutory bar issue. All other issues and defenses were reserved for a subsequent trial which would become necessary only if defendant is unable to sustain its burden of proving the affirmative defense referred to above.

8. The Gregory patent is entitled "VALVE PROTECTING CAP FOR AEROSOL-TYPE CONTAINERS", and its teaching pertains to a particular type of small plastic cap which fits over the valve of an aerosol container in such a way as to retard access to said valve, and, in the event of tampering, to make such pre-sale use obvious. This type of device is commonly referred to as a tamperproof seal.

9. The tamperproof seal claimed in the Gregory patent is defined in five claims. Because the claims are substantively identical, claim 1 is representative of all five claims for purposes of discussion herein unless otherwise specified. Claim 1 reads as follows:

"1. A protective cap for an aerosol-type dispensing container, which container is characterized by a body member having a dispensing opening in a wall thereof with a valve assembly supported in said opening by a closure of cup-like shape which opens upwardly and is provided with an inwardly facing annular recess in its outside wall, said protective cap being formed of transparent plastic material and comprising a tubular valve covering body section with an integral closure at one end thereof, a tubular base section of

substantially less height than the body section and having an internal diameter somewhat greater than the external diameter at the edge of the open end of said body section and peripherally spaced, readily breakable members connecting the open end of said body section with said base section, said body section extending into said base section radially spaced from said base section and having its open bottom end spaced above the bottom end of the base section, said base section being constructed and arranged so that it may be seated in said recess, bottomed within said closure and retained therein frictionally engaged with the inner annular surface of said outside wall while an axially directed force is applied to the body section to break said connecting members and free said body section whereby said body section may be removed and discarded thereby providing access to said valve."

10. The seal described in the above claim is designed to cover an aerosol container spray button and includes two principal sections: (1) the "tubular valve covering body section" or dome, and (2) the "tubular base section" or mounting ring which is substantially shorter than the dome. The dome and mounting ring are connected by "readily breakable members" or frangible webs which are positioned between the open end of the body section and with the internal wall of the mounting ring. The dome has its bottom end spaced above the bottom end of the ring and the upper surface or floor of the mounting cup of the container so that the connecting webs may be broken by a downward force applied to the top of the dome. The mounting ring of the seal is "locked" onto the aerosol container by positioning the projections which extend from the outside of the mounting ring inside an annular recess in the mounting cup wall. Thus the tamperproof seal is forced downward into the mounting cup recess.

11. The connecting webs of the seal must be broken to gain access to the spray button. The webs of the Gregory seal may be broken by pulling the dome up, by twisting it or by pushing the dome sideways or downward.

12. The Gregory seal may be classified as a "push-down" seal. Such a seal is distinguised from "tear-off" seals by an elevation of the dome or body section of the seal above the mounting cup wall, whereas the dome of tear-off seals is positioned against the floor of the mounting cup. The only alleged improvement of the claims of the Gregory patent over those of the original application filed in 1960 is the above described elevation of the dome section of the seal which gives the device its "push-down" characteristic.

13. Defendant originally relied on what has become DX 46 as a "representative sample" of the type of tamperproof seal whose sale and offering for sale in the United States allegedly constituted a statutory bar to the Gregory patent under 35 U.S.C. § 102(b). It is clear from the record that defendant never claimed that DX 46 was the specific seal which defendant sold and offered for sale in the relevant time period.

14. In the latter part of 1967 defendant secured a specific sample of the alleged statutory bar seal which he thereupon revealed to the plaintiff. The above seal has become DX 45.

15. There is no functional and no substantive structural distinctions between DX 45 and the Gregory patent claims. The only structural difference between the two is the design of the projection(s) which secure the seal to the mounting cup of an aerosol container. The seal disclosed by the Gregory patent is held into the mounting cup by means of several "external (locking) projections" instead of one complete annual locking projection.

16. DX 45 is virtually identical to the tamperproof seal disclosed by the Gregory patent. DX 45 functionally and structurally embodies the invention claimed in each of the Gregory patent claims.

17. In late 1958 or early 1959, as President of a Dutch company, known as Aerosol Company Holland (ACH), Mr. Louis Workum, a Dutch citizen, obtained a license to make tamperproof seals. Mr. Workum determined to make a "push-down" seal as an improvement over the tear-off type seals with which he was familiar. Accordingly, he designed the seal and the mold for making it, and at his direction, the technicians at Aerosol Company Holland and the technicians of Plasticum N.V., a Dutch molding company, undertook to produce the "push-down" tamperproof seal DX 45 and the mold for making it. The tamperproof seal resulting from those efforts was DX 45. Plasticum N.V. was "not able to make the structures [DX 45] from these molds for anyone else", and there was only one mold in existence for making it.

18. Mr. Workum testified that the *only* tamperproof seal product which ACH had for its use and sale in 1960, and prior to the time ACH moved its plant from one location in Holland to another in late 1961, was DX 45. Mr. Workum further testified that several million of the tamperproof seals (DX 45) were used in his aerosol filling factory in 1959 and 1960, and that the "push-down" feature was demonstrated by him to others, including Mr. Stanley Goldberg, the then president of defendant.

19. Mr. Workum also testified that he recalls selling and shipping the DX 45 seals to Aerosol Research Company in 1960, and that ARC was his only customer for them in the United States. He also stated that the only unmounted seals sold (those which were not attached to aerosol cans and shipped to customers of Aerosol Company Holland) were those DX 45 seals sold to defendant. Mr. Workum stated that Exhibit 45 "is the only cap or seal that Aerosol of Holland ever sent to Aerosol Research Company."

20. Mr. Lawrence Phillips testified that he was the chief assistant to defendant's president in 1960 and was familiar with all of the products the company had

for sale at the time. He described the seals imported from Holland and their "push-down" operation. He stated that DX 45 was the seal that defendant "imported from ACH in 1960" and was the only seal that defendant had for sale at that time.

21. Mr. Irving Goldberg, who was a salesman for defendant in 1960 and sold DX 45 in 1960, distinguished DX 45 from other seals he was shown at the trial. He identified DX 45 as being the seal received by defendant from ACH in 1960, and as being "the only ones I had" to show to customers and to sell. He stated that defendant had no other similar product at the time. He described the structure of the seals and their "push-down" function. He further testified to his efforts to interest his customers in the seal and to sell seals to them in 1960, and the documents he identified demonstrate his interest in and efforts to sell the seals at that time. Indeed, he testified that he personally delivered the first quantity of DX 45 seals sold by defendant in September 1960 to Capital Packaging Co.

22. Mrs. Joan Phillips testified that she was employed by defendant in 1960 and 1961 as sales service manager and "handled all inside sales, customer contacts" from within the company. Although she could not categorically identify DX 45 as the specific piece received from Holland, she did state that the imported seal which she had on her desk and which she had handled and tried-out for "fun" in 1960 "was very similar to that [DX45], *if not it*." She also testified that the only seals defendant had for sale in 1960 were the "push-down" seals imported from ACH.

23. The documentary evidence corroborates the testimony of these witnesses as to defendant's purchase of the DX 45 seals from ACH and the sale of those seals.

24. The first sizable shipment of the Dutch tamperproof seals imported by defendant was made about September 15, 1960. That is shown by a letter and an invoice sent by ACH, each of which re-

fers to a shipment of 1,000 tamperproof "capsules". (Mr. Workum testified that "capsules" was a term widely used in Europe to refer to tamperproof seals). Mr. Workum identified those documents as originating with ACH and recalled the shipment to which they refer. Mr. Phillips identified the documents as having been received by defendant in September 1960 and stated that they referred to DX 45. The seals identified in those documents were shipped to defendant via Royal Dutch Airlines on or about September 15, 1960, the date stated on DX 5, and were received by defendant.

25. Just prior to October 21, 1960, Aerosol Research Company received a further shipment of 100,000 Dutch tamperproof seals from ACH. This was testified to by the witnesses and is confirmed by a number of exhibits. DX 9 is an ACH letter dated October 13, 1960 stating that 100,000 seals were to be shipped on October 14 via Pan American flight No. 161. Mr. Workum dictated that letter and recalled shipping those seals to defendant. The paid invoice file of defendant contains a bill from Pan American Airways for the freight charge for that shipment, which bill refers to the fact that seven cartons of plastic seals were shipped on Pan American flight 161 on 14 October 1960. This bill was paid by defendant on January 6, 1961. The invoices referred to in the October 13, 1960 letter were referred to in a subsequent letter dictated by Mr. Workum and an attachment of December 21, 1960 from ACH to defendant. Receipt of the 100,000 seals and the other enclosures accompanying the October 14, 1960 shipment was acknowledged by defendant by a letter of October 21, 1960. Mr. Workum recalled receiving that letter and stated that it referred to his October 13th letter.

26. The first shipment of 1,000 seals received by defendant from Holland were sold on or about September 23, 1960 to Capital Packaging Co. Defendant's invoice to Capital Packaging Co. states, and Mr. Irving Goldberg testified, that Mr. Goldberg personally delivered those seals to Capital Packaging Co. The seals delivered to Capital Packaging Co. were those imported from Holland.

27. Most of the 100,000 seals imported in the second shipment from Holland were sold quite promptly. On or about October 21, 1960, Mrs. Phillips prepared an order form for 71,425 seals to be sold to Capital Packaging Co., and an invoice for the DX 45 seals listed on the order form was prepared. That order was shipped in five cartons to Capital Packaging Co. by defendant via DeMar Cartage, Inc., an independent trucking concern, prior to October 24, 1960.

28. Defendant sold a further quantity of the imported seals to Chase Products Co., on or about January 6, 1961. This sale was preceded by offers to sell those seals to Chase Products Co. Mrs. Phillips testified that in October 1960 and pursuant to the direction of Mr. Stanley Goldberg (then the president of defendant) she prepared sample orders for Dutch tamperproof seals to be sent to Chase Products Co., that those samples were shipped, and that the seals shipped on those sample orders were those imported from ACH. These seals were again offered for sale to Chase Products Co. in December 1960. Mr. Svendsen, the President of Chase Products Co., testified that he recalled receiving samples from defendant, that he recalled that they came from Europe, and that he would not have ordered the seals as he did if he had not had samples previously.

29. Thereafter, Chase Products Co. ordered the 25,000 imported seals. Mrs. Phillips testified that she prepared the order forms on January 4, 1961. Mr. Svendsen acknowledged the order both in his testimony and by his letter of January 6, 1961. On January 4, 1961, receipt of the order for 25,000 seals was acknowledged by defendant and the order was then shipped via DeMar Cartage on January 6, 1961 under defendant's invoice 27454, all prior to January 11, 1961, and more than a year prior to the Gregory patent filing date.

30. Mr. Phillips and Mrs. Phillips each testified that the seals "sampled" and those shipped in early January 1961 to Chase Products Co. were those imported from Holland, the only ones defendant had for sale.

31. The evidence also establishes that Aerosol Research Co. made a number of other offers to sell the Dutch tamperproof seals to prospective users in this country prior to January 11, 1961.

32. Exemplary of those additional offers to sell DX 45 is the one made to Par Industries of Los Angeles, California on November 7, 1960. On that date Mr. Stanley Goldberg wrote to Par Industries offering to sell the Dutch seals and indicating that samples would be promptly shipped. Mr. Goldberg's letter "was a sales letter" the purpose of which was to sell the tamperproof seals which defendant imported from Holland. Sample order forms were filled out, and the samples were shipped pursuant thereto.

33. Similar offers to sell DX 45 accompanied by the submission of sample lots were made to the following companies on or about the indicated dates, as substantiated by the exhibits identified and by the witnesses' testimony: S. C. Johnson & Sons, Racine, Wisconsin, on or about December 3, 1960; Aerosol Corporation of the South, Arlington, Tennessee, on or about December 14, 1960; LaMaur Inc., Minneapolis, Minnesota, on or about December 16, 1960; Thommasson of Pennsylvania, Norristown, Pa., on or about November 23, 1960; Aeropak, Inc., of Chicago, Illinois, on or about October 4, 1960.

34. The testimony of the witnesses and the documents offered at the trial clearly and convincingly establishes that defendant secured Dutch tamperproof seals and placed them "on sale" in the United States prior to January 11, 1961. The Court finds as a fact that defendant made sales of DX 45 prior to January 11, 1961, as follows, to:

Sale to Capital Packaging Co. in September 1960;

Sale to Capital Packaging Co. in October 1960; and

Sale to Chase Products Co. on or before January 6, 1961.

The Court finds as a fact that defendant, prior to January 11, 1961, made offers to sell tamperproof seals DX 45 to:

Chase Products Co. in October 1960, and again in December 1960;

Par Industries in November 1960;

S. C. Johnson & Sons in December 1960;

Aerosol Corporation of the South in December 1960;

LaMaur Inc., in December 1960;

Thommasson of Pennsylvania in November 1960;

Aeropak, Inc. in October 1960.

35. Each of the sales and offers to sell referred to Finding 34 individually constitutes a placing "on sale" within the meaning of 35 U.S.C. § 102(b). Further, they collectively constitute such a placing "on sale".

36. The Gregory patent was issued on a continuation-in-part application on January 11, 1962. The original patent application, Serial No. 72,959, filed on December 1, 1960, did not disclose a push-down seal, but was limited to a tear-off type of tamperproof device in which the bottom of the body or dome section rests on the floor of the mounting cup. It is thus uncontested that the plaintiff must rely on the January 11, 1962 filing date as against the statutory bar defense based upon DX 45.

37. DX 46 is also a push-down type of tamperproof seal and, therefore, plaintiff is also limited to the January 11, 1962 filing date of the continuation-in-part application as against a statutory bar defense based on DX 46.

38. The Young patent No. 3,125,259, cited by the Patent Office Examiner during the prosecution of the Gregory patent, discloses a two-piece tamperproof seal which includes a dome section connected to a mounting ring by breakable members. However, the dome is

positioned directly over the mounting ring. The connecting members are therefore in a vertical relationship with the dome and the mounting ring. The Young device is not sufficiently similar to DX 46 to allow the conclusion that the Patent Office considered Claim 1 of the Gregory patent not to be anticipated by a device such as DX 46.

39. Nevertheless, the Court finds that DX 46 is structurally and functionally different from both DX 45 and the Gregory patent for purposes of the statutory bar issue.

40. The significant structural difference between DX 46 and DX 45 is that the dome of DX 45 (and that of the Gregory patent) extends into the mounting ring while the dome of DX 46 extends to or slightly above its mounting ring. Thus, the mounting ring in DX 45 and the Gregory patent affords protection to the frangible webs connecting the dome and the mounting ring.

41. DX 46 cannot be relied upon as a statutory bar device pursuant to 35 U.S.C. § 102(b).

42. Two of the plaintiff's witnesses, Mr. Kimmel and Mr. Svendsen, both of whom were presidents of customer companies of the defendant during the relevant statutory period, testified that they thought they received DX 46 and not DX 45 from defendant in 1960.

43. Mr. Kimmel testified that he felt that the seals he received pursuant to a letter dated October, 1960 (DX 8A) were "like", "similar" and "of the same type as" DX 46. He never did categorically state that he received DX 46. Furthermore, he testified that he did purchase DX 45, although sometime after the seal which was alleged to be similar to DX 46.

44. On this point defendant has introduced the testimony of the designer of both DX 45 and DX 46 that DX 45 was the only seal he had to sell in 1960 and that it was not until after he moved his plant to a new location in 1961 that a mold for DX 46 was first made. He categorically stated that DX 46 did not exist until late 1961 or 1963 and that the only seal he shipped to defendant was DX 45.

45. Mr. Irving Goldberg, a salesman for defendant, testified that the only samples which he had to give to customers, including Mr. Kimmel, were DX 45.

46. Mr. Svendsen's deposition testimony was equivocal as to exactly what seals he received from defendant during the relevant period. Furthermore, his categorization of DX 46 as a "twist-off job" indicates a lack of familiarity with the device.

47. Defendant's witnesses were in a much better position to recall what it was that defendant had for sale in 1960. This is especially true of Mr. Workum, the designer of DX 45 and DX 46.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter and the parties of this suit. Venue was properly laid in this judicial district.

2. Plaintiff is the owner, by assignment, of United States Letters Patent No. 3,162,329 issued December 22, 1962.

3. A presumption of validity attaches to a patent. 35 U.S.C. § 282. This presumption is " * * * not an idle gesture * * * and is not to be overthrown except by clear and cogent evidence." Copease Mfg. Co. v. American Photocopy Equipment Co., 298 F.2d 772, at 777 (7th Cir. 1961).

4. If the claimed subject matter of a patent has been in use or on sale more than one year prior to the filing date of a patent, the claims of that patent are barred and invalid. 35 U.S.C. § 102(b).

5. The burden of proof to establish public sale or on sale more than one year prior to the application date of the patent, is on the defendant.

6. Prior public use or on sale for more than one year must be established by clear and convincing proof. A mere preponderance of evidence is not sufficient. But, importing the criminal law rule of beyond a reasonable doubt

makes only for confusion. Julian v. Drying Systems Co., 346 F.2d 336, at 338 (7th Cir. 1965).

■ 7. Section 102(b) does not require an actual sale, but only "a placing on sale" of the patented article to render the patent invalid. Churchill v. American Buff Co., 365 F.2d 129, at 134 (7th Cir. 1966). An unrestricted distribution of samples to the public also constitutes a bar under Section 102(b). *Id.*

8. It has been uniformly held that a single public use or sale of the claimed subject matter of a patent more than one year prior to the filing date of the patent invokes the proscriptive effect of Section 102(b). Churchill v. American Buff Co., 365 F.2d 129, at 134 (7th Cir. 1966). See also Egbert v. Lippman, 104 U.S. 333, at 336, 26 L.Ed. 755 (1881).

■ 9. Section 102(b) makes no distinction between public use or sale by the inventor or by a third party for the purposes of setting up the statutory bar. Magee v. Coca-Cola Co., 232 F.2d 596, at 600 (7th Cir. 1956).

■ 10. The test for determining anticipation under Section 102(b) requires that the same or virtually identical device or invention has been previously disclosed in a single prior structure, patent or description. Illinois Tool Works, Inc. v. Continental Can Co., Inc., 273 F.Supp. 94 (N.D.Ill.1967), aff'd. 397 F.2d 517.

■ 11. Defendant has established, by clear and convincing testimony and documentary evidence, that (1) the pushdown seal (DX 45) which it sold met the claims of the Gregory patent structurally and functionally, and (2) defendant sold and offered that tamperproof seal for sale on a number of occasions prior to January 11, 1961. Each of those sales and offers for sale was a "placing on sale" within the meaning of Section 102 (b).

12. Thus defendant has sufficiently proved a statutory bar defense under Section 102(b), and, therefore, the Gregory patent is hereby found to be invalid.

13. Any Conclusion of Law which may be considered a Finding of Fact, shall be deemed a Finding of Fact, and any Finding of Fact which may be considered a Conclusion of Law shall be deemed a Conclusion of Law.