REFRIGERATION PATENTS CORPORATION v. STEWART–WARNER CORPORATION.

POTTER REFRIGERATOR CORPORATION v. SAME.

Nos. 8804, 8805.

Circuit Court of Appeals, Seventh Circuit.

Feb. 4, 1947.

Rehearing Denied March 20, 1947.

John D. Black, Ross O. Hinkle, Leon F. Shackell and Albin C. Ahlberg, all of Chicago, Ill., for appellant.

Watson, Bristol, Johnson & Leavenworth, Leonard A. Watson, Lawrence Bristol, David A. Woodcock and Elmer R. Helferich, all of New York City, Arne B. Hummeland and George A. Chritton, both of Chicago, Ill., for appellees.

Before SPARKS and KERNER, Circuit Judges, and BALTZELL, District Judge.

SPARKS, Circuit Judge.

By separate complaints the defendant was charged on the same day with infringement of three United States patents, to wit: No. 2,056,165 issued to Bronaugh and Potter on October 6, 1936, on an applica-

tion filed February 16, 1931, and subsequently assigned to plaintiff, Refrigeration Patents Corporation; No. 2,171,712 issued to Potter on September 5, 1939, on an application filed October 25, 1935; and No. 2,258,959 issued to Potter on October 14, 1941, on an application filed June 5, 1934. The latter two patents were subsequently assigned to plaintiff, Potter Refrigerator Corporation.

The usual defenses of non-infringement and invalidity were pleaded, and both cases were submitted to the same jury, which returned a verdict of not guilty as to the third patent, and guilty as to the first and second patents. The jury assessed damages in favor of the Refrigeration Patents Corporation, for infringement of the first patent, in the amount of $225,000, and in favor of Potter Refrigerator Corporation in the sum of $13,000, for infringement of the second patent. Judgments were rendered accordingly, and from those relating to the first and second patents, defendant has appealed. There is no appeal from the judgment with respect to the third patent.

The asserted revolutionary disclosure here involved is a household refrigerator which has two separate storage compartments, one called a cooling compartment, having a temperature above freezing, whose coil, therefore, never requires defrosting; and a cold storage compartment for housing frozen foods, ice cubes and the like. The avoidance of frosting on the coil in the cooling chamber is effected by means of a thermal control on the coil in that compartment which prevents the temperature from falling to the freezing point, thus preventing the freezing of the moisture which normally condenses on the coils. The maintenance of comparative temperatures in the two compartments is also aided by the proportioned insulation of the two separate chambers (as well as by the fact of their physical separation) in that the insulation is heavier around the cold storage, or freezing, compartment. The temperature of the freezing compartment is regulated by an expansion valve in the refrigerant circuit leading to the freezing chamber. As stated in the specifications: "This arrangement whereby one temperature is controlled by a thermostat and another by an expansion valve is a novel feature of our invention."

The specifications further state:

"The main object of this invention is the design of a refrigerator which will make it possible at one and the same time and over long or short periods of time to perform several highly desirable tasks, namely to form ice or freeze desserts quickly, to provide cold storage for frozen meat and food stuffs, and to provide storage for food at temperatures above freezing.

"The second object is to construct a cabinet in which the ice-making or freezing unit is thermally insulated from the food storage department.

"The third object is the construction of a refrigerator which is not a compromise between a quick freezing refrigerator and one which is ideal for food storing, but which will possess both of these properties in maximum quantities. * * *

"The seventh object is to eliminate completely all defrosting and objectionable drying out of the foods."

Appellees assert that heretofore in the household refrigeration art the construction has been a compromise between the desired objects of a *freezing* compartment and a *cooling* cabinet; that one of the inherent drawbacks to the single cabinet was that the freezing process withdrew moisture from foods, such as vegetables and fruits, making them less palatable, whereas in their structures the foods in the cooling chamber retained their moisture; the coil structure itself (such as a "finned" coil), in the cooling chamber is such that it retards the forming of frost, in that it has greater surface area than formerly utilized.

The claims in suit are quoted in the margin.[1]

---

[1] Patent No. 2,956,165

10. A refrigerator comprising a cabinet formed with a cooling compartment and a freezing compartment, said compartments being insulated from each other and from the outside atmosphere, an expansion line passing through the freezing and cooling compartments, said line including a freezing coil in the freezing compartment and a non-frosting coil in

We are at once confronted by the very recent opinion of the Supreme Court in the case of Halliburton Oil Well Cementing Co. v. Walker, 67 S.Ct. 6, 7. There the Court held a patent invalid for failure to comply with Rev.Stat. 4888, 35 U.S.C.A. § 33. That statute requires the patentee to state his invention in *"such full, clear, con-*

the cooling compartment, an expansion valve in said line at its point of entrance into the freezing compartment, means for forcing refrigerant through said line, and a controller for said means actuated by temperatures in the cooling compartment, the thermal insulation of the compartments being relatively so proportioned as to admit a greater inflow of heat into the cooling compartment than into the freezing compartment.

11. A refrigerator comprising a cabinet formed with a cooling compartment and a freezing compartment thermally insulated from each other and from the outside atmosphere, refrigerating means for cooling the freezing compartment to a lower temperature than that of the cooling compartment, and thermo-sensitive means in one of the compartments for controlling said refrigerating means, the thermal insulation of the compartments being so relatively proportioned as to admit a greater inflow of heat into the cooling compartment than into the freezing compartment.

12. A household refrigerator comprising a cabinet having at least two food chambers thermally insulated from each other and from the outside atmosphere, and a refrigerating system constructed and arranged to cool one of said chambers far below the freezing point of water and the other chamber above said freezing point, said system comprising an expander in each chamber and apparatus within the cabinet for circulating a volatile fluid through such expanders, said fluid constituting the sole refrigerant thus circulated, said system also including means constructed and arranged to maintain the external surface temperature of the expander in the warmer chamber above said freezing point.

14. A household refrigerator comprising a cabinet having at least two food chambers thermally insulated from each other and from the outside atmosphere, and a compressor-condenser-expander system constructed and arranged to cool one of said chambers far below the freezing point of water and the other chamber above said freezing point, said system comprising a chilling element in each chamber and apparatus within the cabinet for circulating a volatile fluid through the chilling elements, said fluid constituting the sole refrigerant in said system, said system also including means constructed and arranged to maintain the external surface of the chilling element in the warmer chamber above said freezing point.

16. A household refrigerator comprising a cabinet having at least two food chambers thermally insulated from each other and from the outside atmosphere, and a compressor-condenser-expander system constructed and arranged to cool one of said chambers far below the freezing point of water and the other chamber above said freezing point, said system comprising a pair of chilling elements connected in series with one of the elements in each chamber and apparatus within the cabinet for circulating a volatile fluid through said elements, said fluid constituting the sole refrigerant in said system, said system also including means constructed and arranged to maintain the external surface of the chilling element in the warmer chamber above said freezing point.

18. A household refrigerator comprising a cabinet having at least two food chambers thermally insulated from each other and from the outside atmosphere, and a compressor-condenser-expander system constructed and arranged to cool one of said chambers far below the freezing point of water and the other chamber above said freezing point, said system comprising a chilling element in each chamber and apparatus within the cabinet for circulating a volatile fluid through the chilling elements, said fluid constituting the sole refrigerant in said system, said system also including means constructed and arranged to maintain the humidity in the warmer chamber at a relative value of at least 100 per cent at 32 degrees Fahrenheit.

Patent No. 2,171,712

8. A household refrigerator, comprising a cabinet having heat insulating walls and provided with a heat insulating partition dividing the interior of the cabinet into a pair of cooling chambers, means for cooling one of the chambers to a much lower temperature than the other, the cabinet being formed with an outer doorway into which both of the chambers open, an outer door adapted to close said outer doorway, the cabinet being also formed with an inner doorway for the cooler of the two chambers, an inner door adapted to close said inner doorway and spaced from said outer door, and sealing means for preventing the air in the warmer chamber from circulating into and out of the space between the doors when both doors are closed.

*cise, and exact terms* as to enable any person skilled in the art or science to which it appertains * * * to make, construct, compound, and use the same; and in case of a machine, *he shall explain the principle* thereof, and the best mode in which he has contemplated applying that principle, so as to distinguish it from other inventions; and *he shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his* invention or discovery. * * *"

It is readily apparent that the emphasis is upon clarity of the invention claimed. This is not alone to teach those interested in the art the manner of constructing the new invention—it is to delimit the rights of the patentee and thereby permit others freely to do further research in bettering the invention, without fear of threat of infringement.

In the Halliburton case the Supreme Court held that the claim must state the *"physical structure"* of the device,—the physical relation of the improvement to the old machine. The claim must describe "the manner in which the * * * addition will operate together with the old * * * machine so as to make the 'new' unitary apparatus perform its designed function." It held that the claims failed adequately to depict the structure, mode and operation of the parts of the combination.

The Court further held that the claim should not describe the new element "in terms of *what it will do* rather than in terms of its own physical characteristics or its arrangement in the new combination apparatus," and that the same rigid standards of description required for product claims is required for a combination patent embodying old elements only.

■ Before applying the statutory test to the instant problem we are confronted by the further rule of law that the sufficiency of description of a claim, under the foregoing statute, is a question of fact for the jury or trial court. Bank v. Rauland Corp., 7 Cir., 146 F.2d 19. We have carefully studied the trial judge's admirable exposition of patent law in his instructions to the jury in the instant case. He submitted the issue of validity of the claims and their infringement, to the jury, giving them instructions on many specific angles of the patent law, but he nowhere cited this requirement of the statute, or its phraseology, nor did he submit that phase of the issue of their validity to them for their consideration and determination. At the beginning of the instructions he stated that patents "are presumed to be valid, but that presumption can be overcome and the patents held to be invalid if they do not fulfill or come up to the legal standards and requirements. These standards and these requirements will be discussed more at length later in this charge." But the issue of clarity and phraseology was not submitted to them. It was not passed upon in the trial court's memorandum on the petition for rehearing. Nor did defendant's motion for a directed verdict mention this point. However, paragraphs 12, 13 and 15 of defendant's answers do clearly and specifically raise the issue of validity of the claims under the statutory requirement of Sec. 33.

■ As we view the record, there has been no determination of the validity of the claims, as to their sufficiency under the statute, unless such conclusion be inherent in a verdict and judgment of recovery against the defendant. We conclude that where, as here, there was no instruction on the matter, the issue was ignored and therefore must be determined by this court.

■ We have studied the claims of the patents in suit, the points raised in appellees' brief on the issue of clarity of phraseology, and the Supreme Court's opinion in the Halliburton case, supra. We conclude there has been such a want of clarity that, as a mattter of law, the patents must be held invalid.

Appellees state: "The contention that the means for maintaining the upper coil below freezing and the differential insulation are functionally claimed only, are technical objections that could be raised in practically any case where the claimed invention was not limited to the precise details shown. It is the last resort of the infringer brought to book."

In the Halliburton case, supra, the Court said: "* * * The language of the claim thus describes this most crucial ele-

ment in the 'new' combination in terms of what it will do rather than in terms of its own physical characteristics or its arrangement in the new combination apparatus. We have held that a claim with such a description of a product is invalid as a violation of Rev.Stat. § 4888 * * *." We can not, therefore, discard as captious the statutory requirement of specificity of description.

Again, appellees state that appellant, in quoting the statute, has omitted the vital clause which provides: "and in case of a machine, he shall explain the *principle* thereof, and the best *mode* in which he has contemplated applying that principle, so as to distinguish it from other inventions." (Italics theirs.) They further say, "This alone shows that it is not the intent, *particularly 'in the case of a machine,'* that the patentee be restricted to the precise construction disclosed as his illustrative example."

As an answer to this contention, the Halliburton case, supra, states: "Patents on machines which join old and well-known devices with the declared object of achieving new results, or patents which add an old element to improve a preexisting combination, easily lend themselves to abuse. And to prevent extension of a patent's scope beyond what was actually invented, courts have viewed claims to combinations and improvements or additions to them with very close scrutiny. * * * It is quite consistent with this strict interpretation of patents for machines which combine old elements to require clear description in combination claims. * * * Cogent reasons would have to be presented to persuade us to depart from this established doctrine."

Appellees say that "neither defendant, nor anyone else, need have any difficulty in determining whether its coil is so constructed and operated as to be non-frosting * * *." Since a "non-frosting coil" is a desired *result,* and not a means, it seems evident to us that patentees should be entitled at most only to their particular inventive means to achieve that result, not every possible means which may be con-

ceived in the future to achieve the same result. As the Supreme Court said in the Halliburton case, supra: "In this age of technological development there may be many other devices beyond our present information or indeed our imagination which will perform that function and yet fit these claims. And unless frightened from the course of experimentation by broad functional claims like these, inventive genius may evolve many more devices to accomplish the same purpose. * * *."

Appellees' argument continues: "As to the law cited by defendant * * * that the claims are for an exhausted combination and void as claiming more than what was invented, we have shown that the invention was not in a particular element but *in a new combination of elements which cooperated to produce new results. * * *"*

We cannot view appellees' stride in the refrigerator art with such enthusiasm—there was here no *new* combination of elements. There was at best an old combination with some of the elements somewhat varied, such as a finned coil; or an additional element added, such as a "thermosensitive means in one of the compartments for controlling said refrigerating means"; or a duplication or aggregation of old elements, such as the two separated insulated compartments in the box, instead of one old insulated compartment.

There was in appellees' alleged invention no *new* result—there was an allegedly *improved* result—i. e., non-frosting coil, and non-dehydrating of foods, which improvement the jury's verdict established.

The Court in the Halliburton case, supra, was dealing with a combination machine claim, and it stressed again and again the need for clarity of the new element claimed, the differentiation from the known existing combinations. Substantiation of this statement is found in the numerous quotations heretofore set forth.

We come finally, to an examination of the claims under consideration. They are for a combination of numerous elements, variously and equivalently stated in the respective claims. We have charted these

elements so they can be more carefully examined, and have numbered them, for easy reference.[2]

Elements 1 and 2, for a "refrigerator comprising a cabinet" and "a cooling compartment" are unimportant and need no

[2]

| Element | Appears in Claim No. |
|---|---|
| 1 A refrigerator comprising a cabinet | 10–14, 16, 18 |
| 2 a cooling compartment | 10, 11 |
| a chamber cooled above freezing point | 12, 14, 16, 18 |
| 3 a freezing compartment | 10, 11 |
| a chamber cooled far below freezing point of water | 12, 14, 16, 18 |
| 4 compartments being insulated from the outside and from each other and from the outside atmosphere | 10 |
| thermally insulated from each other and from the outside atmosphere— | 11, 12, 14, 16, 18 |
| the thermal insulation of the compartments being relatively so proportioned as to admit a greater inflow of heat into the cooling compartment than into the freezing compartment | 10, 11 |
| 5 an expansion line passing through the freezing and cooling compartments | 10 |
| refrigerating means for cooling the freezing compartment to a lower temperature than that of the cooling compartment | 11 |
| refrigerating system constructed and arranged to cool one of said chambers far below the freezing point of water and the other chamber above said freezing point | 12 |
| a compressor-condenser-expander system constructed and arranged to cool one of said chambers far below the freezing point of water and the other chamber above said freezing point | 14, 16, 18 |
| 6 a non-frosting coil in the cooling compartment | 10 |
| 7 an expansion valve in said line at its point of entrance into the freezing compartment | 10 |
| 8 thermo-sensitive means in one of the compartments for controlling said refrigerating means | 11 |
| a controller for said means actuated by temperatures in the cooling compartments | 10 |
| means constructed and arranged to maintain the external surface in the expander in the warmer chamber above said freezing point | 12, 14, 16, 18 |
| 9 said system comprising an expander in each chamber | 12 |
| said system comprising a chilling element in each chamber | 14, 18 |
| said system comprising a pair of chilling elements connected in series with one of the elements in each chamber | 16 |
| 10 means for forcing refrigerant through said line | 10 |
| apparatus within the cabinet for circulating a volatile fluid through said expanders (or chilling elements) | 12, 14, 16, 18 |
| 11 said fluid constituting the sole refrigerant thus circulated | 12, 14, 16, 18 |
| 12 means constructed and arranged to maintain the humidity in the warmer chamber at a relative value of at least 100% at 32 degrees F. | 16 |

discussion. Elements 2 and 3, "a chamber cooled above freezing point" and "a freezing compartment" are not *per se* new. The alleged invention lies in the combination and maintenance of both a cooling and a freezing chamber in the *same* ice cabinet. Elements 7, 9, 10, 11, and 12, also need no discussion.

The composite phraseology of element 4 as it appears in all the claims involved in the suit may be stated thus: Compartments being thermally insulated from the outside and each other, the thermal insulation of the compartments *being relatively so proportioned as to admit a greater inflow of heat into the cooling compartment than into the freezing compartment*. This language is not *"exact."* No attempt is made to teach what are the desirable proportions in the thermal insulation. It is obvious that inflow or exclusion of heat would vary with the degree of insulation. This is hardly a "written description * * * of the manner of * * * constructing * * * in such full, clear, concise, and exact terms as to enable any person skilled in the art * * * to * * * construct * * * the same." The instruction is as vague and broad as could possibly be.

The essence of element 5 is:

an expansion line passing through the freezing and cooling compartments

for cooling the freezing compartment to a lower temperature than that of the cooling compartment

or

arranged to cool one of said chambers far below the freezing point of water and the other chamber above such freezing point.

This element seems to us to state simply the desired result, or the result to be achieved, without in any manner telling how the end is to be achieved. If it were to be held valid, it would cover any conceivable means hereafter invented where the results stated were obtained, if the present expansion line system were utilized in any form. Such broad coverage is obviously not permissible under the teachings of the Halliburton case, *supra.*

Element 6, appearing in claim 10 only, does present a more serious question. It

is "a non-frosting coil in the cooling compartment." It is this non-frosting coil which saves the housewife the chore of repeated defrosting of the box, with some possible inconvenience and possible spoilage of foods, especially frozen foods. However, here again we have only a claim of a *result* without the statement of the *means* whereby that result is to be obtained. Nowhere in the specifications or drawings is a special kind of coil shown whose structure, such as "finning," might be a frost-collecting deterrent. Indeed, it was agreed by the experts of all parties that a coil may be non-frosting when it is operated in one way, and become frosted if operated in another way. Clearly, the non-frosting coil is the result of the use of the combinations upon which plaintiffs seek to sustain the patents.

Element 8 describes a

thermo-sensitive means in one of the compartments for controlling said refrigerating means

or

a controller for said means actuated by temperatures in the cooling compartment

or

means constructed and arranged to maintain the external surface in the expander in the warmer chambers above said freezing point.

Here again, vagueness of description of "means" to achieve the result is evident.

As we read all these claims they are merely a description in the most general terms of the machine patentees had in mind. If they achieved patentable invention, as the jury and trial court believed, they have failed to describe it with the precision required by 35 U.S.C.A. § 33, as interpreted by the Halliburton case, supra.

Claim 8 of patent No. 2,171,712, covers the same sort of machine as the patent above dealt with except that there is an inner sealing door on the freezing compartment to further effect the retention of cold in said chamber and exclude the outside atmosphere. It is subject to the same defects as is the first patent.

The judgments of the District Court are reversed.