Donald A. **HOLLEY**, Plaintiff,
v.
**OUTBOARD MARINE CORPORATION,**
a Delaware corporation, Defendant.

**No. 60 C 671.**

United States District Court
N. D. Illinois, E. D.

Feb. 20, 1964.

Charles B. Spangenberg, Wallenstein, Spangenberg & Hattis, Chicago, Ill., for plaintiff.

Timothy L. Tilton, Dawson, Tilton, Fallon, Lungmus & Alexander, Chicago, Ill., for defendant.

DECKER, District Judge.

This is a suit charging defendant with knowing and wilful infringement of Claim 3 of United States Letters Patent No. 2,536,642, issued January 2, 1951, from an application filed by plaintiff on September 10, 1949. Plaintiff seeks an injunction, accounting, treble damages by reason of the allegedly wilful infringement, costs and expenses and attorney's fees. Defendant answered, denying infringement, and alleged that Claim 3 of the patent in suit was invalid (1) for failure to claim an invention within the meaning of 35 U.S.C. § 112; (2) because anticipated by the prior art; (3) as unpatentable for lack of invention over the art as exemplified by eight prior patents, only three of which were relied upon by defendant at trial.[1]

---

1. The following patents were pleaded in the amended answer:

| | | | | | |
|---|---|---|---|---|---|
| (1) Rayfield | No. 1,418,397, | issued | June | 6, | 1922 |
| (2) Rayfield | No. 1,528,788, | " | March | 10, | 1925 |
| (3) Giesler | No. 1,558,009, | " | Oct. | 20, | 1925 |
| (4) Giesler | No. 1,561,153, | " | Nov. | 10, | 1925 |
| (5) Drapeau | No. 2,228,446, | " | Jan. | 14, | 1941 |
| (6) Drapeau | No. 2,327,342, | " | Aug. | 24, | 1943 |
| (7) Fernstrum | No. 2,457,991, | " | Jan. | 4, | 1949 |
| (8) Brubaker | No. 2,468,735, | " | May | 3, | 1949 |
| (9) Morgan | No. 2,471,533 | " | May | 31, | 1949 |

In the original answer, the above-cited patents numbered (3), (5), (6), (7) and (9) were said to invalidate the patent in suit for lack of invention, in addition to the following:

| | | | | |
|---|---|---|---|---|
| Wolf | No. 1,550,862, | issued | Aug. 25, 1925 |
| Vincent | No. 1,595,433, | " | Aug. 10, 1926 |

The patent in suit, entitled "Method of and Means for Controlling the Coolant of Marine Internal-Combustion Engines," relates to a marine engine cooling system which utilizes a water bypass line. By stipulation the issues at trial were limited to the questions of the validity of Claim 3 of the patent, and its alleged infringement by defendant in its 5½, 10 and 18 horsepower outboard motors for the model years 1959, 1960 and several months of 1961.

Before discussing the issues, it may be helpful to review some of the background evidence.

In brief, marine cooling systems are constructed with the danger in mind of fire from overheated exhaust manifolds and pipes. Because of this possibility, it was thought necessary to maintain a constant flow of water through the exhaust pipe. Prior to plaintiff's invention, then, the typical marine engine cooling system involved only the pumping of water from the source (the body of water in which the boat is floated) directly through the engine water jacket, and thence through the exhaust pipe with waste gases. Because of the absence of provision for the retention of water in the water jacket until a desirable engine operating temperature had been reached, the engine ran "cold." When running cold, an engine fails to vaporize the fuel properly so as to burn the low ends. This results in the generation of acids and the formation of condensation. In automobiles, by way of distinction, the problem of inflammable gas accumulation is not present, and the exhaust manifold and pipe are air-cooled.

Plaintiff testified to experience in the repair and servicing of automobiles in various shops from 1916 to 1947, either as a repairman or manager. Around 1940 he began to work on marine engines and subsequently became interested in problems connected with their cooling systems. His initial experiments resulted in a model of a recirculating type of cooling system which was tested in Minnesota for the Redwing Machine Corporation in 1949. When engine temperature was cold, a single valve operating between two seats caused the recirculation through the engine of water which otherwise would be pumped overboard. The main difficulty with this system was its failure to provide cooling water for the engine's exhaust pipe during periods of warm-up when the coolant was being retained in the engine water jacket.

He then began work on the system which forms the subject matter of the patent in suit. The divergent requirements of such a system were recognized as the need for (1) a continual flow of water through the exhaust pipe for cooling purposes, (2) sufficient cooling water in the water jacket to avoid overheating of the engine, and (3) the capability of retaining water within the water jacket when it was sought to raise engine temperature to a desirable operating level. Assuming the normal range of water temperature in the body of water in which the boat was floated, these ends could not be attained by the continual circulation of water through the water jacket. Plaintiff's solution was to employ a feature of a recirculating system tested for Redwing—the retention of water within the cooling system until engine temperature was sufficiently high —without that system's reduction in the flow of water overboard through the exhaust manifold and pipe. This was accomplished by the use of two lines into which the incoming flow of water could be directed. One led through the water jacket; the other bypassed it. Water passing through the bypass line had no effect upon engine temperature. Flow was apportioned between the lines by the operation of an expandable thermostat located at the point of their juncture on the outlet side of the cooling system. When the engine was cold and the bellows contracted, a valve disc blocked the passage of water through the water jacket. Since the flow of water into the engine remained substantially constant, the effect was to channel the incoming flow into the bypass line and thence overboard. As the engine warmed up, movement of the thermostatic valve directed

increasing proportions of the total flow through the water jacket. The volume of water pumped through the cooling system and exhaust pipe was unaffected by the apportionment between the two lines.[2]

Having perfected the device, plaintiff filed his patent application in September of 1949. Thereafter, he approached a number of dealers in an attempt to market the cooling system. One of these contacts was with the Chris-Craft Corporation which plaintiff heard was opposed to the installation of thermostatically-controlled cooling systems because of their supposed unreliability.[3] As a result of tests and demonstrations in 1950, plaintiff secured an order for 144 units for installation on Chris-Craft engines. The system worked to the buyer's satisfaction, and regular purchases were still being made at the time of trial.

Plaintiff's first contact with the defendant company came in January of 1951, when he initiated negotiations with Matt Gruben & Sons, an Iowa agent of defendant. Plaintiff's system was installed on one of defendant's engines, which the Grubens supplied, and successful tests were conducted. An appointment was then arranged by Matt Gruben between defendant and plaintiff for November of 1952. At this time, in Waukegan, Illinois, plaintiff met defendant's Chief Engineer, Clay Conover, had a short conversation with him relative to the patent in suit, and left drawings and a description of his invention.[4] Holley testified at trial that while interest in his system was expressed, Conover indicated that defendant's engineers were experimenting with a similar system. No further negotiations between the parties were had in connection with the patent in suit, although plaintiff was told at the initial conference that purchase of his system would be considered if defendant's own efforts proved unsuccessful.

Though defendant's experiments with thermostatically-controlled cooling systems began around 1943, it was not until

2. See Findings of Fact 7–10.

3. A "Service Bulletin" (PX 28–1), mailed to Chris-Craft dealers prior to approval of plaintiff's cooling system, explains the position of the company in this regard:

"July 12, 1950

"Service Bulletin #227

"SUBJECT: Thermostats

"There seems to be some misunderstanding in regard to our recommendations of thermostats, particularly as being advertised by the Amot People.

"We have not under any circumstances recommended or approved the installation of this type of water temperature control.

"Water temperature control will, without a question, improve the low speed performance of an engine, but the hazards encountered by the installation of the recirculating type of control is so great that we do not believe that their installation is warranted.

"In a recirculating type system, the thermostat shuts off the flow of the water through the engine and the water is recirculated through the pump. If for any reason because of failure of the thermostat unit or plugging of the unit, or corrosion, the thermostat does not open properly, the water will continue to recirculate and the engine will be overheated.

"Also during the period of warm up, there is so little water going through the exhaust pipe that the pipe and the elbow get extremely hot causing premature failure of the elbow and an objectionable hollow noise through the exhaust pipe.

"Also this type of system recirculates the hot water through the oil cooler which limits [its] capacity to cool the oil.

"We are experimenting with many types of thermostats and we have a system that looks very good and we are about ready to release it, but we want to be sure that we are right.

CHRIS CRAFT CORPORATION
RMK:mls R. Mack Krebs
 Service Manager"

4. Mr. Conover stated in his deposition that he did not recall the visit. A letter bearing his signature, however, subsequently was sent to plaintiff in connection with a portion of their conversation which did not relate to the issues involved here. Mr. Watkins, defendant's Director of Research, also wrote plaintiff, mentioning the fact of the latter's visit to the Waukegan plant.

October 2, 1953, that Lucius A. Watkins, defendant's Director of Research, submitted a sketch and written description suggesting the development of a bypass type system. Thereafter, patent No. 2,741,231, assigned to defendant, issued to Watkins on April 10, 1956. The specific construction shown by this patent is substantially similar to plaintiff's patented system, as well as defendant's accused system, but was never marketed.

In 1959 plaintiff had occasion to examine one of defendant's marine outboard motors. Finding a cooling system he regarded as infringing his own, plaintiff gave notice to defendant on September 8, 1959. Defendant denied infringement, but made certain changes in its temperature control system in late 1960 and early 1961,[5] and this litigation followed.

I now consider the issues raised by the pleadings and the evidence.

## VALIDITY OF THE PATENT IN SUIT

▇▇▇ In determining the question of patent validity, the Court is guided by the statutory presumption of validity, 35 U.S.C. § 282. "This presumption is not an idle gesture, * * * and is not to be overthrown except by clear and cogent evidence. * * *" Copease Mfg. Co. v. American Photocopy Equipment Co., 298 F.2d 772, 777 (7 Cir. 1961). And where, as in the instant case, prior art was not cited by the Patent Office, "it is as reasonable to conclude that * * * [it was] considered and cast aside because not pertinent, as to conclude that it was inadvertently over-

looked." Artmoore Co. v. Dayless Mfg. Co., 208 F.2d 1, 4 (7 Cir. 1953).

▇▇▇ At the same time, the Supreme Court has indicated that combination patents may be subject to a more stringent test of inventiveness than others: they must "add to the sum of useful knowledge. * * * A patent for a combination which only unites old elements with no change in their respective functions * * * obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. * * *" Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950). "Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements." Ibid.

Understandably, considerable difficulty inheres in the practical translation of general formulations such as the above. The problem is well stated in Kwikset Locks, Inc. v. Hillgren, 210 F.2d 483, 485–486 (9 Cir. 1954), where the Court said:

"What constitutes 'invention' defies precise definition. The courts have attempted at least to fix some guideposts to indicate wherein the realm of invention lies. These judicial attempts at definition are either very sweeping and consequently general, or so narrow as to be applicable only to a specific device or process. And at times the courts are content to establish what is definitely not inventive. To require

---

5. These changes apparently were first considered after the issuance of an intracompany memorandum dated September 7, 1960 (PX 6–1), from Mr. Conover to, among others, Mr. F. T. Irgens, Vice President in charge of Engineering for defendant. It reads:
"I am informed by Mr. Irgens that it is the company's desire that we go ahead with the blocking type cooling system to supersede the by-pass cooling system, in view of our patent infringements.

"It is highly desirable that these changes be put through as promptly as possible, even though it will mean a model change during the selling season.
"Care should be taken that the change notices explain the legal aspects and that there are no added sales advantages."
The records of these engineering changes (PX 12–1, 13–1, 14–1) state, "This change being made for the purpose of avoiding infringement of Holley patent 2,536,642."

'exceptional imaginative talent' or 'creative genius' or to declare that there must be an 'impalpable something' which 'spring[s] from that intuitive faculty of the mind' is of no concrete aid to a judge who is a layman in the fields of science and engineering."

The standard of patentability to be employed is most often drawn from the interpretation in Hotchkiss v. Greenwood, 52 U.S. (11 How.) 248, 266, 13 L.Ed. 683 (1850), that for a device to be patentable it must not only be new and useful, but represent the application of ingenuity and skill beyond that possessed by the ordinary mechanic trained in the art. Though it has been noted that courts of late have tended to require more in the way of inventiveness,[6] this Circuit has continued to follow Hotchkiss. See, e. g., Barie v. Superior Tanning Co., 182 F.2d 724, 727 (7 Cir. 1950), terming "unfortunate" the reference in Cuno Eng'r. Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58 (1941), to a "flash of creative genius" as a possible measure of patentability.

Since 1952, however, the inquiry must extend beyond interpretations of the Hotchkiss case to the provisions of the Patent Act, 35 U.S.C. §§ 101–103. Sections 101 and 102 are codifications of the prior law. Section 103 is new, stating:

"Conditions for patentability; non-obvious subject matter

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

Legislative history indicates that the second sentence of Section 103 was intended to discard "flash of genius" as a test of patentability.[7] While the question is not free from ambiguity,[8] it appears that by the first sentence Congress intended some relaxation of the standards of patentability, or at least a rejection of decisions regarded as undercutting Hotchkiss. This is the view adopted in several of the Circuits,[9] although this Circuit seems not to have

---

6. E. g., Davis, The Impact of Recent Supreme Court Cases on the Question of Patentable Invention, 44 Ill.L.Rev. 41 (1949).

7. See Reviser's Note following 35 U.S.C. § 103.

8. E. g., the main purpose of the bill is said to be codification of prior law with some minor procedural changes, H.R.Rep.No.1923, 82d Cong., 2d Sess. 3 (1952), but in the same House report reference is made to "a number of changes in substantive statutory law." Id. at 5, U.S.Code Cong. and Adm.News 1952, p. 2397.

In Mr. Justice Black's concurring opinion in Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 347, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961), the following exchange is cited as indicative of congressional intent: Asked by Senator Saltonstall whether the proposed act would "change the law in any way or only codify the present laws," Senator McCarran, Chairman of the Judiciary Committee which had been in charge of the bill for the Senate, replied, "It codifies the present laws." On the same page of the Congressional Record appears a portion of a prepared statement submitted by Senator McCarran: "In view of the decisions of the Supreme Court and others as well as trial by practice and error there have been some changes in the law of patents as it now exists * * *." 98 Cong.Rec. 9323 (1952).

9. The leading case is Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530, 535–537 (2 Cir.), cert. denied, 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799 (1955). Cases following Lyon include Reiner v. I. Leon Co., 285 F.2d 501 (2 Cir. 1960), cert. denied, 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961); L-O-F Glass Fibers Co. v. Watson, 97 U.S.App.D.C. 69, 228 F.2d 40 (1955); Honolulu Oil Corp. v. Shelby Poultry Co., 293 F.2d 127 (4 Cir. 1961); Fisch v. Gould, 246

considered the question directly. See, e. g., Noble Co. v. C. S. Johnson Co., 241 F.2d 469 (7 Cir. 1957); Blaw-Knox Co. v. I. D. Lain Co., 230 F.2d 373, 376 (7 Cir. 1956).

Despite the prevailing conflict between Circuits, the persuasive interpretation of Section 103 is that which attributes to it the expression of congressional desire for some change away from a narrow construction of inventiveness. 'This section should have a stabilizing effect and minimize great departures which have appeared in some cases." H.R.Rep.No.1923, 82d Cong., 2d Sess. 7 (1952), U. S. Code Cong. and Adm. News 1952, p. 2400.

In his Commentary on the New Patent Act, 35 U.S.C.A. preceding § 1, at pages 22–23 (1954), Federico states that:

"While it is not believed that Congress intended any radical change in the level of invention or patentable novelty, nevertheless, it is believed that some modification was intended in the direction of moderating the extreme degrees of strictness exhibited by a number of judicial opinions over the past dozen or more years; that is, that some change of attitude more favorable to patents was hoped for."

In the light of these authorities, I now consider the evidence in this case bearing on the issue of patentability.

### The Prior Art

■ In its answer, defendant pleaded the invalidity of the patent in suit as anticipated by the prior art, 35 U.S.C. § 102, citing only the Morgan patent No. 2,471,533, issued May 31, 1949, for a marine engine cooling system. In the amended answer, Morgan was deleted and citation was made to the Rayfield

patent No. 1,528,788, issued March 10, 1925, and the Giesler patent No. 1,561,-153, issued November 10, 1925. The Morgan patent must be considered, though, since evidence as to it was introduced and accepted without objection at trial. (Hereinafter, these patents are discussed as "Morgan," "Giesler," and "Rayfield." A second Rayfield patent,[10] to which reference will not be made, was pleaded but not mentioned at trial.)

The initial question is whether plaintiff has "invented" or discovered a "new and useful" device within the meaning of 35 U.S.C. §§ 100–102. As to its usefulness, there can be no argument. Adoption of plaintiff's temperature control system was shown to have a positive effect upon the operating efficiency of marine engines on which it was installed. Whether the system qualifies as new, though, depends in part upon distinctions between automotive and marine engines.

In 1949, when plaintiff's invention was developed, the conventional automobile was equipped with a cooling system resembling those shown in the Giesler and Rayfield patents, both of which share with plaintiff's system a number of common elements. I find, however, that the differences in operation and purpose between automotive and marine engine cooling systems are so substantial that the automotive systems cannot be said to anticipate the patent in suit. First, while defendant's expert, Mr. Middendorf, testified that automotive engines may be converted to and utilized as marine engines, the process normally requires changes and modifications which but emphasize the fundamental differences between the two systems. Second, the principal object of the automotive cooling systems disclosed by the

---

F.2d 5 (3 Cir. 1957), cert. denied, 355 U.S. 914, 78 S.Ct. 341, 2 L.Ed.2d 273 (1958); R. M. Palmer Co. v. Luden's, Inc., 236 F.2d 496 (3 Cir. 1956); Contra, Caldwell v. Kirk Mfg. Co., 269 F.2d 506 (8 Cir.), cert. denied, 361 U.S. 915, 80 S.Ct. 260, 4 L.Ed.2d 185 (1959); Bobertz v. General Motors Corp., 228 F.2d

94 (6 Cir. 1955), cert. denied 352 U.S. 824, 77 S.Ct. 32, 1 L.Ed.2d 47 (1956); Vincent v. Suni-Citrus Prods. Co., 215 F.2d 305 (5 Cir. 1954). See also, Rich, Principles of Patentability, 28 Geo.Wash. L.Rev. 393, 405 (1960).

10. No. 1,418,397, issued June 6, 1922.

Giesler and Rayfield patents is to prevent the freezing of the cooling medium used therein. This purpose is entirely dissimilar from the purpose stated for the patent in suit.[11]

The Morgan patent is the only pertinent prior art which concerns marine engines. The significant distinction between it and the patent in suit is the employment in Morgan of two cooperating valves. The first valve, which is thermostatically-operated, controls or blocks the flow of water through the engine water jacket. The second valve is pressure-operated and opens to release water from the system only when the other valve is in a closed position. The operation of the thermostatic valve in affecting water pressure within the cooling system clearly distinguishes its function from that of the single valve in plaintiff's system. While not determinative, it is noteworthy that, in obtaining the aforementioned Watkins patent, defendant characterized Morgan as remote.

I therefore find that the patent in suit is not anticipated by Giesler, Rayfield or Morgan.

In addition to arguing anticipation by the three patents just discussed, defendant suggests that a combination of elements from Giesler and Rayfield (or from Giesler, Rayfield and Morgan) anticipates or renders obvious the patent in suit.

■ Once a system such as plaintiff's is marketed, it, of course, becomes possible to speculate as to its similarity to a particular combination of elements from prior patents. Hindsight, however, is not the test of obviousness or anticipation. Shumaker v. Gem Mfg. Co., 311 F.2d 273, 276 (7 Cir. 1962); Hazeltine Research, Inc. v. Dage Elec. Co., 271 F.2d 218, 225 (7 Cir. 1959); In re Linnert, 309 F.2d 498 (C.C.P.A.1962). Nor is it alone sufficient that other systems might have been adapted without too much difficulty to produce the object and function of the patent in suit. Copease Mfg. Co. v. American Photocopy Equip. Co., supra, 298 F.2d at 780–782.

■ ■ As noted above, a statutory predicate to patentability is a finding that the device in question would not have been obvious at the time the invention was made to a hypothetical person skilled in the art. 35 U.S.C. § 103. Unobviousness is the statutory version of what was once the judge-made requirement of "invention." In re Papesch, 315 F.2d 381, 386 (C.C.P.A.1963). Thus, although it may be pertinent to show a similarity between the elements of the patent in suit and elements drawn from various examples of the art in the same or analogous fields, unless those skilled in the art reached the solution of the patent holder, the statutory test must still be applied. The task is complicated when, as here, the device consists of a combination of elements previously known. As a guide, courts have isolated certain indicia of unobviousness,[12] through the application of which a relatively objective decision is possible.[13] In the instant case, the record permits the use of several such standards.

---

11. See Findings of Fact 15–20; Record, pp. 161–165, 472–93.

12. E. g., Copease Mfg. Co. v. American Photocopy Equip. Co., 298 F.2d 772, 780–782 (7 Cir. 1962); Honolulu Oil Corp. v. Shelby Poultry Co., 293 F.2d 127, 131–132 (4 Cir. 1961); Reiner v. I. Leon Co., 285 F.2d 501, 503–504 (2 Cir. 1960).

13. In Schaefer, Inc. v. Mohawk Cabinet Co., 276 F.2d 204, 207 (2 Cir. 1960), Judge Hand wrote:
"This scrutiny amounts to nothing more than a common-sense appraisal: where a particular aggregation of recognized elements produces something novel, it is patentable; where it merely embellishes one of the ingredient elements, it is not. We agree that that standard is always subjective, the creature of an imagination projected upon the future out of materials of the past. The law is full of such standards, without which we should again and again be throttled by an infinity of prescriptions. The best we can do is to set forth in detail the reasons which appear, not only to justify, but to demand, our conclusion."

(1) Was there a felt need of some duration for an advancement in the art? The Giesler and Rayfield patents, which most closely approximate the patent in suit, were both issued in 1925 but never adapted for use with marine engines. Defendant itself had conducted unsuccessful experiments in the field since 1943.

(2) How extensive was the search for an improved system? The evidence indicates general recognition of the need, particularly in the burgeoning market of the post-war years when plaintiff began experiments with marine engine cooling systems.

(3) Did the invention constitute an advance in the art as then practiced? In its simplicity and efficiency, plaintiff's system clearly represented an improvement over its somewhat crude predecessors.

(4) Was the invention recognized as valuable by the trade? The prompt adoption of plaintiff's cooling system by Chris-Craft Corporation, which in prior years had opposed use of thermostatically-controlled systems, is indicative of its impact. See H. W. Gossard Co., J. C. Penney Company, 304 F.2d 515, 517 (7 Cir. 1962). Defendant's imitation of the system is likewise a tribute to its importance. Ric-Wil Co. v. E. B. Kaiser Co., 179 F.2d 401, 404 (7 Cir. 1950). And while evidence of commercial success of itself is insufficient to establish patentability, Kennatrack Corp. v. Stanley Works, 314 F.2d 164, 168 (7 Cir. 1963), it does furnish support for such a finding when other factors point to the same conclusion.

In sum, I conclude that the Morgan, Giesler and Rayfield patents, singly or in combination, do not anticipate plaintiff's patent or render it obvious. Nor is the path taken by plaintiff one which would have been obvious to others skilled in the trade.

### Alleged Functionalism and Misdescriptiveness

The Patent Act requires that specifications in the patent application describe the invention in "full, clear, concise, and exact terms," and conclude with "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. §§ 111, 112.

In its trial brief defendant stated that while there were several specific points of difference between the accused system and the structure defined by Claim 3, the only point which would be stressed "is the fact that Claim 3 requires that the valve be capable of controlling the flow of water through the exhaust. In the accused construction, * * * [t]he flow through the exhaust pipe remains substantially constant." No evidence was produced at trial which would require the expansion of this inquiry.

In view of the language quoted above, it is apparent that defendant reads Claim 3 as stating that the thermostatic valve in plaintiff's system affects or controls the total flow of water through the exhaust pipe and overboard. Clearly, however, the *operation* of the valve in plaintiff's system does not affect total water flow. As with the accused system, the "flow through the exhaust pipe remains substantially constant." The question then is semantic: does the language of the claim describe a system which neither plaintiff nor defendant follows in practice? If so, identity between the systems of the parties does not amount to infringement.

Elements 1 through 4, inclusive, of Claim 3 [14] describe the line which connects the source of water with the en-

---

14. In their briefs, the parties arbitrarily divide Claim 3 into eight separate elements. For the sake of clarity, this division is adopted herein:

"3. [1] In a cooling system for a marine internal combustion engine having a water jacket, [2] a water line communicating with a source of water supply at one end and with said water jacket at the other end, [3] a water pump in said line, [4] a water discharge pipe in said jacket, [5] a valve housing provided with a thermostatically controlled valve member connected to the

gine water jacket, as well as the "water discharge pipe" connecting the water jacket with the thermostatic valve. Element 5 reads, "a valve housing provided with a thermostatically-controlled valve member connected to the end of said discharge pipe." In dispute is element 8, which states (referring to the bypass line as the "second mentioned water line"):

> "said valve capable of controlling the flow of water through said discharge pipe at times and also capable of controlling the flow of water through said exhaust pipe and said second mentioned water line at times."

In its post-trial brief defendant again emphasizes the excerpted phrase, "capable of controlling the flow of water through said exhaust pipe," asserting that it states for the thermostatic valve a separate function which is not performed in practice. Even without the aid of the disclosure of plaintiff's patent, including the specification and drawings, the actual meaning of the claim emerges when the phrase is read in its entirety —"capable of controlling the flow of water through said exhaust pipe and second mentioned water line at times." In this context the phrase indicates that the function of the valve is to "control" the flow of water through the series connection of the *bypass line* and exhaust pipe. This same function is performed by the valve in the case of the series-connected *discharge pipe* and exhaust pipe.

Clarity might be advanced if the function of the valve in its relation to the discharge-exhaust pipe combination were spelled out as it is for the bypass and exhaust pipe (i. e., if element 8 be-

gan, "said valve capable of controlling the flow of water through said exhaust pipe and said discharge pipe at times"). But this fact does not compel a limitation of he word "control" which, in relation to the valve, would equate its meaning to "affecting" or "restricting" the volume of water flow through the exhaust pipe. The obvious function of the valve is to channel or control the flow of water into either the bypass or discharge pipe. Since both lines empty into the exhaust pipe, the valve necessarily "controls" the flow of water through this line as well.

In any event, reference to the specification and drawings of the patent in suit substantiates the correctness of this result. Defendant properly argues that the structural elements "constitute the definition of the invention both for the purpose of determining whether the invention is anticipated by the prior art and for the purpose of determining whether the invention is infringed by the accused device." However, "claims should be construed in the light of the specification and the drawings." Everest v. Duke, 139 F.2d 22, 24 (7 Cir. 1943); Scherbatskoy v. United States Steel Corp., 287 F.2d 552, 556 (7 Cir. 1961); Texas Co. v. Globe Oil & Refining Co., 225 F.2d 725 (7 Cir. 1955). For these reasons, it is my conclusion that Claim 3 adequately describes plaintiff's invention.

Defendant seeks a finding of invalidity on the additional ground that the claim is functional at the point of novelty, citing General Elec. Co. v. Wabash Appliance Corp., 304 U.S. 364, 371, 58 S.Ct. 899, 82 L.Ed. 1402 (1938), and Refrigeration Patents Corp. v. Stewart-Warner Corp., 159 F.2d 972, 978 (7 Cir.

---

end of said discharge pipe, [6] an exhaust pipe communicating at one end with said valve housing and extending at its other end to a point of discharge, [7] and a second water line communicating at one end with said first mentioned water and at its other end with said valve housing member; [8] said valve capable of controlling the flow of water

through said discharge pipe at times and also capable of controlling the flow of water through said exhaust pipe and said second mentioned water line at times."
See Finding of Fact 40 for a comparison of the elements of Claim 3 with the response found in the cooling systems employed by plaintiff and defendant.

1947). Specifically, it is contended that element 5 of Claim 3 is faulty in failing to set forth the structural relation between the valve member and the associated water lines which makes the valve "capable" of the function described in element 8. But it "is familiar law that the description of the invention is addressed to those skilled in the art, [and] its clarity to them, rather than to laymen, is the test. * * *" Ingersoll Milling Machine Co. v. General Motors Corp., 110 F.Supp. 12, 31 (N.D.Ill.1952), aff'd, 207 F.2d 42 (7 Cir. 1953). See also, Binks Mfg. Co. v. Ransburg Electro-Coating Corp. (construing 35 U.S.C. § 112), 281 F.2d 252, 256–257 (7 Cir.), cert. granted, 364 U.S. 926, 81 S.Ct. 353, 5 L.Ed.2d 265 (1960), writ dismissed, 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239 (1961); In re Nelson, 280 F.2d 172, 47 CCPA 1031 (1960). I find no merit in defendant's position. The structural elements of plaintiff's invention are not unfamiliar in the trade. It is not likely that any skilled person would experience difficulty in understanding the system defined by the claim, or in making the connection between the valve member and water lines therein.

## INFRINGEMENT

The question of infringement is treated in more detail in the Findings.[15] It is enough to note here that there is no substantial difference between the cooling systems in issue, and that the record requires a holding for plaintiff. Both systems employ similar valve assemblies; the effect of the valve movement in both is to control the flow of incoming water through one of two lines. Both systems operate to increase or decrease the flow of water through the respective lines in response to temperature changes; both maintain substantially constant water jacket temperatures, and both maintain substantially constant pressure levels and flow volume regardless of valve movement. And while, for a time, defendant may have felt that it was not infringing, or that plaintiff's patent was invalid in view of the prior art, there finally seems to have been recognition within its organization that changes were necessary to avoid infringement.

At the same time, plaintiff failed to satisfy the burden of proof which rests with him in charging wilful infringement. Artmoore Co. v. Dayless Mfg. Co., 208 F.2d 1, 5–7 (7 Cir. 1953). Defendant's agent Conover, the one person shown to have knowledge of plaintiff's system, denied recollection of his 1952 meeting with plaintiff. In view of the passage of time, this is not unlikely.

Once notified by plaintiff of its infringement, defendant took steps which culminated in the decision to alter the type of cooling system used on its infringing engines. Moreover, as in Enterprise Mfg. Co. v. Shakespeare Co., 141 F.2d 916, 921 (6 Cir. 1944):

"If honestly mistaken as to a reasonably debatable question of validity, an infringer should not be made to smart in punitive damages. Compensatory damages constitute adequate remuneration * * * unless the refusal of the infringer to bow to the presumptive validity of an issued patent is consciously wrongful."

## MOTION FOR AMENDMENT

At the close of its case, defendant orally moved for leave to amend its answer to conform with testimony by plaintiff "as to the abuse of the [patent] monopoly . . . in requiring Chris-Craft to purchase his valves as a condition to having a license from him." (Record, p. 528.) As no amendment was proffered, a ruling on this motion was deferred. A month later defendant filed a written motion for leave to file its second amended answer, by which it was sought (1) to delete five prior art patents which had been pleaded as anticipating plaintiff's invention, but were not relied on at trial, and to apply the Morgan patent as an anticipation as well as

15. Findings of Fact 30–45.

to show the state of the art; (2) to add the defense of unenforceability because of the alleged misuse of the patent in suit.

### Change in Patents Pleaded

 It is basic that amendments are to be freely permitted under Rule 15, Fed.R.Civ.P., 28 U.S.C.A. Their allowance, nevertheless, is discretionary with the Court even in the case of conforming the pleadings to evidence adduced at trial. Considerations of justice and fairness are determinative.

Defendant's motion to delete a number of defensively-pleaded patents is somewhat unique. Normally, of course, amendments serve the purpose of adding affirmative positions. No suggestion is made as to the purpose to be served by the allowance of the motion save for the intimation that pleadings not supported by proof should or must be stricken.

Fairness or the advancement of the merits of this cause would not seem to be involved, and no support has been cited or found in the case law or reason for amending an answer because of a failure of evidence to support it.

 Plaintiff suggests that he was required to prepare his case on the basis that defendant pleaded these five additional patents in its amended answer, and that defendant should not be relieved of the onus of its well-conceived strategy by the simple expedient of making a tardy amendment after trial. I agree with plaintiff, and accordingly deny this portion of defendant's motion.

 In the original answer, the Morgan patent was cited both as an anticipation and as a reference showing the state of the art.[16] In the amended answer it was omitted from the list of patents said to anticipate plaintiff's.

Defendant's witness Irgens testified at trial without objection that Morgan *did* anticipate the patent in suit. In view of plaintiff's failure to make objection, the evidence is to be considered by the Court under Rule 15, and the pleadings may be amended to reflect its admission. This portion of defendant's motion is granted.

### The Misuse Defense

 The first question presented is whether defendant has a right to plead the defense at this state of the litigation. Plaintiff opposes amendment on the grounds that the motion is inexcusably tardy and that, in any case, 35 U.S.C. § 282 requires that such a defense have been affirmativly pleaded prior to trial.[17]

In respect to the timeliness of the motion, a review of the evidence shows that defendant had ample opportunity prior to trial to raise the misuse issue, and yet failed to do so. The basis of its motion is an arrangement between plaintiff and Chris-Craft Corporation for sales to the latter of plaintiff's patented system, as well as unpatented components for use therein.

In an uncontroverted affidavit submitted by plaintiff's attorney in opposition to the motion, it is asserted that prior to or subsequent to the filing of this suit, plaintiff's counsel informed defendant's counsel that plaintiff had an agreement with Chris-Craft under which royalties were being paid for the use of the Holley patent. Notwithstanding this knowledge, defendant took no steps toward discovery as to the terms of this agreement until about two months prior to trial, at which time plaintiff, in response to defendant's request for copies of any license agreements issued by Holley, delivered to defendant copies of

16. Note 1, supra.

17. For the purposes of this discussion, it may be assumed that the section contemplates the affirmative pleading of misuse as within the defenses mentioned: "equitable defenses such as laches, estoppel and unclean hands." See Federico,

Commentary on the New Patent Act, 35 U.S.C.A., preceding § 1, at page 55. As with any affirmative defense, however, once proof is accepted by the court, failure to have pleaded it does not preclude its consideration.

the letters embodying plaintiff's agreement with Chris-Craft. Thereafter, defendant took plaintiff's deposition and neglected to direct any question to plaintiff regarding the Chris-Craft correspondence. A pretrial conference was held on March 5, 1963, for the purpose of settling the issues, and following this a pre-trial stipulation was entered into between the parties limiting the issues to (1) infringement and (2) invalidity.

Although informal discussions took place during this period between opposing counsel, defendant took no steps to amend its pleading or to include the misuse issue in the pretrial stipulation.

■■■ Defendant's only excuse for its tardiness was that it was not apprised of the verbal extension of the Chris-Craft agreement until plaintiff was cross-examined during the trial. However, the first question directed to the plaintiff on this issue is indicative of some prior knowledge:

"Q. As I understand your arrangement with Chris-Craft, * * * in order to get a license under your patent they have to buy the thermostat from you, is that correct?"

Furthermore, defendant's unexplained failure to commence discovery along these lines until two and one-half years after the filing of its answer is sufficient ground to bar raising of the misuse defense at this late date. In Frank Adam Elec. Co. v. Westinghouse Elec. & Mfg. Co., 146 F.2d 165 (8 Cir. 1945), for example, the refusal of the trial court to allow a second amendment to an answer was upheld on appeal. There, the "unclean hands" defense had been asserted more than two years after the filing of the answer. A nearly identical fact situation was before the Court in Stiegele v. J. M. Moore Import-Export Co., 312 F.2d 588 (2 Cir. 1963). Having suffered an adverse interlocutory judgment in a patent infringement case, defendant appealed, *inter alia*, the lower court's denial of leave to file an amended answer setting up an anti-trust defense. The proposed amendment was submitted on August 29, 1961; the answer had been filed on March 16, 1959. While the "special nature of the defense of unclean hands should lead courts to grant leave to amend pleadings in this respect more freely than is usually the case," id. at 595, defendants' "inadequately explained delay" in submitting the motion was said by the Court to justify its denial.

The Court of Appeals in this Circuit (Henriksen v. Cory Corporation, Jan. 20, 1964, 327 F.2d 409) recently discussed the propriety of the District Court's overruling of the defense of misuse where the defendant was guilty of unexplained delay in pleading the defense before trial.

The explanations defendant offers in the instant case are not convincing. Accordingly, this portion of its motion to amend is denied.

■■■ Defendant argues, however, that it should be permitted the benefit of this defense because of the public interest in patent grants. At trial, evidence as to the misuse defense was accepted over plaintiff's objection. I am constrained to agree with defendant that the evidence should be considered even in the absence of appropriate pleadings. In Frank Adam Elec. Co. v. Westinghouse Elec. & Mfg. Co., supra, 146 F.2d at 168, the Court stated:

"In no case do courts of equity reject evidence relevant to the integrity of the Chancellor's conscience or to the public interest, whether relevant to issues presented by the pleadings or not, * *."

See also, Stiegele v. J. M. Moore Import-Export Co., supra, 312 F.2d at 595; General Indus. Co. v. Birmingham Sound Reproducers, Ltd., 194 F.Supp. 693 (E.D.N.Y.1961).

The defense of unenforceability because of patent misuse is sought to be interjected on the basis of Holley's testimony that his written agreement with Chris-Craft was continued in force on a verbal basis after its expiration in 1955. The entire written agreement between the plaintiff and Chris-Craft is contain-

ed in an exchange of letters between them, commencing with plaintiff's letter to Chris-Craft dated June 4, 1952 (PX 32). This letter followed negotiations carried on between plaintiff and Chris-Craft during which plaintiff agreed to make several engine design changes for Chris-Craft in order to accommodate plaintiff's invention in its new four cycle marine engines. These involved the adjustment of Chris-Craft engine manifolds to incorporate the bypass line of plaintiff's system and the design of special housings for plaintiff's temperature control system.

As a part of these negotiations, Chris-Craft agreed to place an initial order for 1,000 thermostats to be incorporated in these specially designed housings. By the terms of the Holley letter of June 4, 1952, plaintiff agreed to furnish such thermostats as Chris-Craft might order for a period of three years, subject to a number of conditions as set forth in the letter. The controversy here revolves around the first condition, which is as follows:

"I agree to furnish the Chris Craft Corporation with Holley temperature control system thermostats for the sum of $2.85 each, it being understood that of this sum $1.00 is paid as a royalty for permitting you to build manifold endplate thermostat housings as standard equipment on your engines and the use of the Holley temperature control system and patent No. 2536642. It is understood that you will exclusively use in such housings thermostats furnished by me."

■■■ Defendant construes this particular provision as conditioning the availability of the patented system upon purchase of the unpatented thermostats, thereby rendering the patent unenforceable because of the attempted extension of the patent grant. The burden of proving these charges, of course, rests with the defendant.

I am unable to agree with the narrow interpretation placed upon this agreement by defendant. It seems to me that when it is interpreted in the light of the circumstances under which the agreement was made, that it provides a combination payment to the plaintiff, representing his right to royalties on his patent and compensation for his services in redesigning the housings to be used by Chris-Craft. The agreement specifically provides that the payment of $1.00 is as a royalty for permitting the use of the manifold endplate thermostat housings as standard equipment *and* the use of the Holley temperature control system. That agreement would seem objectionable only if read as implying Holley's intent to condition the licensing of his patent on purchases of his unpatented thermostats.

Defendant, though, introduced no evidence which would substantiate this theory, and plaintiff testified to the contrary on cross-examination (Record, p. 157):

"Q. As I understand your arrangement with Chris-Craft, the arrangement is, as I interpret these documents, that in order to get a license under your patent they have to buy the thermostat from you, is that correct?

"A. They don't have to buy them from me, no.

"Q. Isn't that what the letter says?

"A. Well, we state that they pay the royalty to save a lot of book work; to just add the royalty to their order for their billing."

Defendant dropped the examination of the plaintiff at this point. If defendant considered the testimony of the plaintiff as confusing and contradictory, defendant could have probed further as to the exact details of the plaintiff's dealing with Chris-Craft under his verbal agreement. Defendant failed to produce any such evidence.

■■■ For a finding of misuse there must be an actual showing of misconduct on the part of the patentee, and the person raising the defense has the burden of making this proof. The inconclusive showing made by the defend-

ant on this issue falls far short of establishing any such misconduct. Accordingly, I find the misuse defense unsupported by the evidence.

 For the reasons indicated here and also expressed in the Findings and Conclusions that follow, it is my conclusion that plaintiff's patent No. 2,536,-642 is valid and has been infringed by defendant.

It is my further conclusion that the defense of misuse has not been proved.

Plaintiff is entitled to the relief prayed for in his complaint. Plaintiff's counsel will prepare and submit a proposed judgment order within ten days.